ARKANSAS WRITERS' PROJECT, INC. *v.* RAGLAND,
COMMISSIONER OF REVENUE OF ARKANSAS

No. 85–1370.   Argued January 20, 1987—Decided April 22, 1987

222

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined, and in Parts I, II, III–B, IV, and V of which STEVENS, J., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 234. SCALIA, J., filed a dissenting opinion; in which REHNQUIST, C. J., joined, *post*, p. 235.

*Anne Owings Wilson* argued the cause and filed briefs for appellant.

*John Steven Clark* argued the cause for appellee. With him on the brief were *R. B. Friedlander* and *Joseph V. Svoboda.**

JUSTICE MARSHALL delivered the opinion of the Court.

The question presented in this case is whether a state sales tax scheme that taxes general interest magazines, but exempts newspapers and religious, professional, trade, and sports journals, violates the First Amendment's guarantee of freedom of the press.

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union Foundation et al. by *Jack Novik* and *Philip E. Kaplan;* for the City & Regional Magazine Association by *Donald M. Middlebrooks;* for the Magazine Publishers Association by *David Minton;* for the Miami Herald Publishing Co. et al. by *Edward Soto, Gerald B. Cope, Jr., W. Terry Maguire,* and *Parker Thomson;* for Time Inc., by *E. Barrett Prettyman, Jr., David J. Saylor,* and *John G. Roberts, Jr.;* and for the Times Mirror Co. et al. by *Rex S. Heinke, William A. Niese,* and *Jeffrey S. Klein.*

Briefs of *amici curiae* urging affirmance were filed for the Territory of American Samoa et al. by the Attorneys General for their respective jurisdictions as follows: *Thomas J. Miller* of Iowa, *Leulumoega S. Lutu* of American Samoa, *Joseph Lieberman* of Connecticut, *Jim Smith* of Florida, *Corinne K. A. Watanabe* of Hawaii, *Jim Jones* of Idaho, *William J. Guste, Jr.,* of Louisiana, *Hubert H. Humphrey III* of Minnesota, *Michael Turpen* of Oklahoma, *LeRoy S. Zimmerman* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Mark V. Meierhenry* of South Dakota, *Jim Mattox* of Texas, *David L. Wilkinson* of Utah, and *Jeffrey L. Amestoy* of Vermont; and for the State of Maryland by *Stephen H. Sachs,* Attorney General, *Ralph S. Tyler III,* Assistant Attorney General, and *Carmen M. Shepard,* Special Assistant Attorney General.

## I

Since 1935, Arkansas has imposed a tax on receipts from sales of tangible personal property. 1935 Ark. Gen. Acts 233, §4, pp. 593, 594, now codified at Ark. Stat. Ann. §84–1903(a) (1980 and Supp. 1985). The rate of tax is currently four percent of gross receipts. §84–1903 (three percent); Ark. Stat. Ann. §84–1903.1 (Supp. 1985) (additional one percent). Numerous items are exempt from the state sales tax, however. These include "[g]ross receipts or gross proceeds derived from the sale of newspapers," §84–1904(f) (newspaper exemption),[1] and "religious, professional, trade and sports journals and/or publications printed and published within this State . . . when sold through regular subscriptions." §84–1904(j) (magazine exemption).[2]

Appellant Arkansas Writers' Project, Inc., publishes Arkansas Times, a general interest monthly magazine with a circulation of approximately 28,000. The magazine includes articles on a variety of subjects, including religion and sports. It is printed and published in Arkansas, and is sold through mail subscriptions, coin-operated stands, and over-the-counter sales. In 1980, following an audit, appellee Commissioner of Revenue assessed tax on sales of Arkansas

---

[1] The newspaper exemption was added in 1941. 1941 Ark. Gen. Acts 386, §4, p. 1060. Gross Receipts Tax Regulations of 1981, adopted by the Arkansas Commissioner of Revenue define a newspaper as "a publication in sheet form containing reports of current events and articles of general interest to the public, published regularly in short intervals such as daily, weekly, or bi-weekly, and intended for general circulation." GR–48(A)(1), reproduced at Record 50.

[2] The magazine exemption was added in 1949. 1949 Ark. Gen. Acts 152, §2, p. 491. The regulations define a publication as "any pamphlet, magazine, journal, or periodical, other than a newspaper, designed for the information or entertainment of the general public or any segment thereof." GR–48(A)(5), reproduced at Record 50. The term "regular subscription" is defined as "the purchase by advance payment of a specified number of issues of a publication over a certain period of time, and delivered to the subscriber by mail or otherwise." GR–48(A)(6), reproduced at Record 50.

Times. Appellant initially contested the assessment, but eventually reached a settlement with the State and agreed to pay the tax beginning in October 1982. However, appellant reserved the right to renew its challenge if there were a change in the tax law or a court ruling drawing into question the validity of Arkansas' exemption structure. Record 46–47.

Subsequently, in *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue,* 460 U. S. 575 (1983), this Court held unconstitutional a Minnesota tax on paper and ink used in the production of newspapers. In January 1984, relying on this authority, appellant sought a refund of sales tax paid since October 1982, asserting that the magazine exemption must be construed to include Arkansas Times. It maintained that subjecting Arkansas Times to the sales tax, while sales of newspapers and other magazines were exempt, violated the First and Fourteenth Amendments. The Commissioner denied appellant's claim for refund. App. to Juris. Statement 12–14.

Having exhausted available administrative remedies, appellant filed a complaint in the Chancery Court for Pulaski County, Arkansas, seeking review of the Commissioner's decision. The complaint also stated a claim under 42 U. S. C. §§ 1983 and 1988 for injunctive relief and attorney's fees. The parties stipulated that Arkansas Times is not a "newspaper" or a "religious, professional, trade or sports journal" and that, during the relevant time period, appellant had paid $15,838.22 in sales tax. The Chancery Court granted appellant summary judgment, construing § 84–1904(j) to create two categories of tax-exempt magazines sold through subscriptions, one for religious, professional, trade, and sports journals, and one for publications published and printed within the State of Arkansas. No. 84–1268 (Pulaski Cty. Chancery Ct., Mar. 29, 1985). Because Arkansas Times came within the second category, the court held that the magazine was exempt from sales tax and appellant was entitled to a refund. The court determined that resolution of the

dispute on statutory grounds made it unnecessary to address the constitutional issues raised in appellant's § 1983 claim.

The Arkansas Supreme Court reversed the decision of the Chancery Court. 287 Ark. 155, 697 S. W. 2d 94 (1985). It construed § 84–1904(j) as creating a single exemption and held that, in order to qualify for this exemption, a magazine had to be a "religious, professional, trade, or sports periodical." *Id.*, at 157, 697 S. W. 2d, at 95. Concluding that "neither party has questioned the constitutionality of the exemption," the State Supreme Court failed to address appellant's First and Fourteenth Amendment claims. *Ibid.*

On petition for rehearing, the court issued a supplementary opinion in which it acknowledged that appellant had pursued its constitutional claims and that they "should have been discussed" in the court's original opinion. *Id.*, at 157, 157A, 157B, 698 S. W. 2d 802, 803 (1985). It rejected appellant's claims of discriminatory treatment, reasoning that exemptions granted to other publications need not be considered, because:

> "[I]t would avail [appellant] nothing if it wins its argument. . . . It is immaterial that an exemption in favor of some other taxpayer may be invalid, as discriminatory. If so, it is the exemption that would fall, not the tax against the [Arkansas] *Times*." *Id.*, at 157A, 698 S. W. 2d, at 803.

As to appellant's First Amendment objections, the court noted that this Court has held that "the owners of newspapers are not immune from any of the 'ordinary forms of taxation' for support of the government." *Ibid.*, quoting *Grosjean* v. *American Press Co.*, 297 U. S. 233, 250 (1936). In contrast to *Minneapolis Star*, *supra*, and *Grosjean*, *supra*, the Arkansas Supreme Court concluded that the Arkansas sales tax was a permissible "ordinary form of taxation." Because the court did not find that appellant's First and Fourteenth Amendment rights had been violated, it did not consider the claim for attorney's fees under § 1988.

We noted probable jurisdiction, 476 U. S. 1113 (1986), and we now reverse.

## II

As a threshold matter, the Commissioner argues that appellant does not have standing to challenge the Arkansas sales tax scheme. Extending the reasoning of the court below, he contends that, since appellant has conceded that Arkansas Times is neither a newspaper nor a religious, professional, trade, or sports journal, it has not asserted an injury that can be redressed by a favorable decision of this Court and therefore does not meet the requirements for standing set forth in *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 472 (1982).

We do not accept the Commissioner's notion of standing, for it would effectively insulate underinclusive statutes from constitutional challenge, a proposition we soundly rejected in *Orr* v. *Orr*, 440 U. S. 268, 272 (1979). The Commissioner's position is inconsistent with numerous decisions of this Court in which we have considered claims that others similarly situated were exempt from the operation of a state law adversely affecting the claimant. See, *e. g., Armco Inc.* v. *Hardesty*, 467 U. S. 638 (1984); *Carey* v. *Brown*, 447 U. S. 455 (1980); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972). Contrary to the Commissioner's assertion, appellant has alleged sufficient a personal stake in the outcome of this litigation. "The holding of the [Arkansas] cour[t] stand[s] as a total bar to appellant's relief; [its] constitutional attack holds the only promise of escape from the burden that derives from the challenged statut[e]." *Orr* v. *Orr, supra,* at 273.

## III

### A

Our cases clearly establish that a discriminatory tax on the press burdens rights protected by the First Amendment.[3]

---

[3] Appellant's First Amendment claims are obviously intertwined with interests arising under the Equal Protection Clause. See *Police Dept. of*

See *Minneapolis Star*, 460 U. S., at 591–592; *Grosjean* v. *American Press Co.*, *supra*, at 244–245. In *Minneapolis Star*, the discrimination took two distinct forms. First, in contrast to generally applicable economic regulations to which the press can legitimately be subject, the Minnesota use tax treated the press differently from other enterprises. 460 U. S., at 581 (the tax "singl[es] out publications for treatment that is . . . unique in Minnesota tax law"). Second, the tax targeted a small group of newspapers. This was due to the fact that the first $100,000 of paper and ink were exempt from the tax; thus "only a handful of publishers pay any tax at all, and even fewer pay any significant amount of tax." *Id.*, at 591.

Both types of discrimination can be established even where, as here, there is no evidence of an improper censorial motive. See *id.*, at 579–580, 592 ("Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment"). This is because selective taxation of the press—either singling out the press as a whole or targeting individual members of the press—poses a particular danger of abuse by the State.

> "A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency." *Id.*, at 585.

Addressing only the first type of discrimination, the Commissioner defends the Arkansas sales tax as a generally ap-

*Chicago* v. *Mosley*, 408 U. S. 92, 94–95 (1972). However, since Arkansas' sales tax system directly implicates freedom of the press, we analyze it primarily in First Amendment terms. See *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 585, n. 7 (1983).

plicable economic regulation. He acknowledges the numerous statutory exemptions to the sales tax, including those exempting newspapers and religious, trade, professional, and sports magazines. Nonetheless, apparently because the tax is nominally imposed on receipts from sales of *all* tangible personal property, see § 84–1903, he insists that the tax should be upheld.

On the facts of this case, the fundamental question is not whether the tax singles out the press as a whole, but whether it targets a small group within the press. While.we indicated in *Minneapolis Star* that a genuinely nondiscriminatory tax on the receipts of newspapers would be constitutionally permissible, 460 U. S., at 586, and n. 9, the Arkansas sales tax cannot be characterized as nondiscriminatory, because it is not evenly applied to all magazines. To the contrary, the magazine exemption means that only a few Arkansas magazines pay any sales tax;[4] in that respect, it operates in much the same way as did the $100,000 exemption to the Minnesota use tax. Because the Arkansas sales tax scheme treats some magazines less favorably than others, it suffers from the second type of discrimination identified in *Minneapolis Star*.

Indeed, this case involves a more disturbing use of selective taxation than *Minneapolis Star*, because the basis on which Arkansas differentiates between magazines is particularly repugnant to First Amendment principles: a magazine's tax status depends entirely on its *content*. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago* v.

---

[4] Appellant maintains that Arkansas Times is the *only* Arkansas publication that pays sales tax. App. 13 (Affidavit of Alan Leveritt). The Commissioner contends that there are two periodicals, in addition to Arkansas Times, that pay tax. Tr. of Oral Arg. 22. Whether there are three Arkansas magazines paying tax or only one, the burden of the tax clearly falls on a limited group of publishers.

*Mosley,* 408 U. S., at 95. See also *Carey* v. *Brown,* 447 U. S., at 462–463. "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan* v. *Time, Inc.,* 468 U. S. 641, 648–649 (1984).

If articles in Arkansas Times were uniformly devoted to religion or sports, the magazine would be exempt from the sales tax under § 84–1904(j). However, because the articles deal with a variety of subjects (sometimes including religion and sports), the Commissioner has determined that the magazine's sales may be taxed. In order to determine whether a magazine is subject to sales tax, Arkansas' "enforcement authorities must necessarily examine the content of the message that is conveyed . . . ." *FCC* v. *League of Women Voters of California,* 468 U. S. 364, 383 (1984). Such official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press. See *Regan* v. *Time, Inc., supra,* at 648.

Arkansas' system of selective taxation does not evade the strictures of the First Amendment merely because it does not burden the expression of particular *views* by specific magazines. We rejected a similar distinction between content and viewpoint restrictions in *Consolidated Edison Co.* v. *Public Service Comm'n of New York,* 447 U. S. 530 (1980). As we stated in that case, "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Id.,* at 537. See *FCC* v. *League of Women Voters of California, supra,* at 383–384; *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 518–519 (1981) (plurality opinion); *Carey* v. *Brown, supra,* at 462, n. 6.

Nor are the requirements of the First Amendment avoided by the fact that Arkansas grants an exemption to other members of the media that might publish discussions of the vari-

ous subjects contained in Arkansas Times. For example, exempting *newspapers* from the tax, see § 84–1904(f), does not change the fact that the State discriminates in determining the tax status of *magazines* published in Arkansas. "It hardly answers one person's objection to a restriction on his speech that another person, outside his control, may speak for him." *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540, 553 (1983) (BLACKMUN, J., concurring). See also *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 757, n. 15 (1976) ("We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means").

## B

Arkansas faces a heavy burden in attempting to defend its content-based approach to taxation of magazines. In order to justify such differential taxation, the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. See *Minneapolis Star*, 460 U. S., at 591–592.

The Commissioner has advanced several state interests. First, he asserts the State's general interest in raising revenue. While we have recognized that this interest is an important one, see *id.*, at 586, it does not explain selective imposition of the sales tax on some magazines and not others, based solely on their content. In *Minneapolis Star*, this interest was invoked in support of differential treatment of the press in relation to other businesses. *Ibid.* In that context, we noted that an interest in raising revenue,

"[s]tanding alone, . . . cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally, avoid-

ing the censorial threat implicit in a tax that singles out the press." *Ibid.* (footnote omitted).

The same is true of a tax that differentiates between members of the press.

The Commissioner also suggests that the exemption of religious, professional, trade, and sports journals was intended to encourage "fledgling" publishers, who have only limited audiences and therefore do not have access to the same volume of advertising revenues as general interest magazines such as Arkansas Times. Brief for Appellee 16. Even assuming that an interest in encouraging fledgling publications might be a compelling one, we do not find the exemption in § 84–1904(j) of religious, professional, trade, and sports journals narrowly tailored to achieve that end. To the contrary, the exemption is both overinclusive and underinclusive. The types of magazines enumerated in § 84–1904(j) are exempt, regardless of whether they are "fledgling"; even the most lucrative and well-established religious, professional, trade, and sports journals do not pay sales tax. By contrast, struggling general interest magazines and struggling specialty magazines on subjects other than those specified in § 84–1904(j) are ineligible for favorable tax treatment.

Finally, the Commissioner asserted for the first time at oral argument a need to "foster communication" in the State. Tr. of Oral Arg. 28, 32. While this state interest might support a blanket exemption of the press from the sales tax, it cannot justify selective taxation of certain publishers. The Arkansas tax scheme only fosters communication on religion, sports, and professional and trade matters. It therefore does not serve its alleged purpose in any significant way.

## C

Appellant argues that the Arkansas tax scheme violates the First Amendment because it exempts all newspapers from the tax, but only some magazines. Appellant contends that, under applicable state regulations, see nn. 1 and 2,

*supra*, the critical distinction between newspapers and magazines is not format, but rather content: newspapers are distinguished from magazines because they contain reports of current events and articles of general interest. Just as content-based distinctions between magazines are impermissible under prior decisions of this Court, appellant claims that content-based distinctions between different members of the media are also impermissible, absent a compelling justification.[5]

Because we hold today that the State's selective application of its sales tax to magazines is unconstitutional and therefore invalid, our ruling eliminates the differential treatment of newspapers and magazines. Accordingly, we need not decide whether a distinction between different types of periodicals presents an additional basis for invalidating the sales tax, as applied to the press.

## IV

In the Chancery Court, appellant asserted its First and Fourteenth Amendment claims under 42 U. S. C. § 1983, as well as a corresponding entitlement to attorney's fees under § 1988. Because this Court has found a constitutional violation, appellant urges us to consider its cause of action under § 1983 and order an award of attorney's fees. However, the state courts have not yet indicated whether they will exercise jurisdiction over this claim[6] and we therefore remand to give them an opportunity to do so.

---

[5] This challenge was made in the courts below, but it was not addressed by either the Chancery Court or the Arkansas Supreme Court. Since the Chancery Court construed the magazine exemption to cover sales of Arkansas Times, it was not necessary to reach the issue. The Arkansas Supreme Court ruled that the sales tax was a generally applicable regulation and did not examine the impact of the magazine exemption or the newspaper exemption. 287 Ark. 155, 157A, 157B, 698 S. W. 2d 802, 803 (1985).

[6] The Chancery Court construed the magazine exemption to apply to sales of Arkansas Times and therefore did not reach the federal cause of action. The Arkansas Supreme Court reversed the Chancery Court's con-

The parties recognize that federal and state courts have concurrent jurisdiction over actions brought under § 1983, see, *e. g.*, *Martinez* v. *California*, 444 U. S. 277, 283, n. 7 (1980), although the Tax Injunction Act, 28 U. S. C. § 1341, ordinarily precludes federal courts from entertaining challenges to the assessment of state taxes. The parties disagree, however, on whether the state court *must* exercise jurisdiction in such cases.[7] We leave it to the courts on remand to consider the necessity of entertaining this claim.

## V

We stated in *Minneapolis Star* that "[a] tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action." 460 U. S., at 592–593. In this case, Arkansas has failed to meet this heavy burden. It has advanced no compelling justification for selective, content-based taxation of certain magazines, and the tax is therefore invalid under the First Amendment. Accordingly, we reverse the judgment of the Arkansas Supreme Court and remand for proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

To the extent that the Court's opinion relies on the proposition that "'government has no power to restrict expression

---

struction of the statute and held that there was no First Amendment violation. It found that it was not necessary to consider appellant's claim for attorney's fees under § 1988.

[7] Whether state courts must assume jurisdiction over these cases is not entirely clear. See Note, Section 1983 in State Court: A Remedy for Unconstitutional State Taxation, 95 Yale L. J. 414, 420–421 (1985). See also *Spencer* v. *South Carolina Tax Comm'n*, 281 S. C. 492, 316 S. E. 2d 386, aff'd by an equally divided Court, 471 U. S. 82 (1984). Of course, an affirmance by an equally divided Court is not entitled to precedential weight. See *Neil* v. *Biggers*, 409 U. S. 188, 192 (1972).

because of its message, its ideas, its subject matter, or its content,'" see *ante*, at 229 (quoting *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972)), I am unable to join it.* I do, however, agree that the State has the burden of justifying its content-based discrimination and has plainly failed to do so. Accordingly, I join Parts I, II, III–B, IV, and V of the Court's opinion and concur in its judgment.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, dissenting.

All government displays an enduring tendency to silence, or to facilitate silencing, those voices that it disapproves. In the case of the Judicial Branch of Government, the principal restraint upon that tendency, as upon other judicial error, is the requirement that judges write opinions providing logical reasons for treating one situation differently from another. I dissent from today's decision because it provides no rational basis for distinguishing the subsidy scheme here under challenge from many others that are common and unquestionably lawful. It thereby introduces into First Amendment law an element of arbitrariness that ultimately erodes rather than fosters the important freedoms at issue.

The Court's opinion does not dispute, and I think it evident, that the tax exemption in this case has a rational basis sufficient to sustain the tax scheme against ordinary equal protection attack, see, *e. g.*, *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307, 312 (1976) *(per curiam)*. Though assuredly not "narrowly tailored," it is reasonably related to the legitimate goals of encouraging small publishers with limited audiences and advertising revenues (a category which in the State's judgment includes most publishers of religious, professional, trade, and sports magazines) and of

---

*See my separate opinions in *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530, 544 (1980); *Widmar* v. *Vincent*, 454 U. S. 263, 277 (1981); and *Regan* v. *Time, Inc.*, 468 U. S. 641, 692 (1984); see also *FCC* v. *League of Women Voters of California*, 468 U. S. 364, 408 (1984).

avoiding the collection of taxes where administrative cost exceeds tax proceeds. See Brief for Appellee 15–16. The exemption is found invalid, however, because it does not pass the "strict scrutiny" test applicable to discriminatory restriction or prohibition of speech, namely, that it be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Ante*, at 231; cf. *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 101 (1972) (discriminatory ban on picketing); *Carey* v. *Brown*, 447 U. S. 455, 461–462 (1980) (same).

Here, as in the Court's earlier decision in *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983), application of the "strict scrutiny" test rests upon the premise that for First Amendment purposes denial of exemption from taxation is equivalent to regulation. That premise is demonstrably erroneous and cannot be consistently applied. Our opinions have long recognized—in First Amendment contexts as elsewhere—the reality that tax exemptions, credits, and deductions are "a form of subsidy that is administered through the tax system," and the general rule that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540, 544, 549 (1983) (upholding denial of tax exemption for organization engaged in lobbying even though veterans' organizations received exemption regardless of lobbying activities). See also *Cammarano* v. *United States*, 358 U. S. 498, 513 (1959) (deduction for lobbying activities); *Buckley* v. *Valeo*, 424 U. S. 1, 93–95 (1976) (declining to apply strict scrutiny to campaign finance law that excludes certain candidates); *Harris* v. *McRae*, 448 U. S. 297, 324–326 (1980) (declining to apply strict scrutiny to legislative decision not to subsidize abortions even though other medical procedures were subsidized); *Maher* v. *Roe*, 432 U. S. 464 (1977) (same).

The reason that denial of participation in a tax exemption or other subsidy scheme does not necessarily "infringe" a fundamental right is that—unlike direct restriction or prohibition—such a denial does not, as a general rule, have any significant coercive effect. It may, of course, be manipulated so as to do so, in which case the courts will be available to provide relief. But that is not remotely the case here. It is implausible that the 4% sales tax, generally applicable to all sales in the State with the few enumerated exceptions, was meant to inhibit, or had the effect of inhibiting, this appellant's publication.

Perhaps a more stringent, prophylactic rule is appropriate, and can consistently be applied, when the subsidy pertains to the expression of a particular viewpoint on a matter of political concern—a tax exemption, for example, that is expressly available only to publications that take a particular point of view on a controversial issue of foreign policy. Political speech has been accorded special protection elsewhere. See, *e. g.*, *FCC* v. *League of Women Voters of California*, 468 U. S. 364, 375–376 (1984) (invalidating ban on editorializing by recipients of grants from the Corporation for Public Broadcasting, in part on ground that political speech "is entitled to the most exacting degree of First Amendment protection"); *Connick* v. *Myers*, 461 U. S. 138, 143–146 (1983) (discussing history of First Amendment protection for political speech by public employees); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969) (upholding FCC's "fairness doctrine," which imposes special obligations upon broadcasters with regard to "controversial issues of public importance"). There is no need, however, and it is realistically quite impossible, to extend to all speech the same degree of protection against exclusion from a subsidy that one might think appropriate for opposing shades of political expression.

By seeking to do so, the majority casts doubt upon a wide variety of tax preferences and subsidies that draw distinctions based upon subject matter. The United States Postal

Service, for example, grants a special bulk rate to written material disseminated by certain nonprofit organizations — religious, educational, scientific, philanthropic, agricultural, labor, veterans', and fraternal organizations. See Domestic Mail Manual § 623 (1985). Must this preference be justified by a "compelling governmental need" because a nonprofit organization devoted to some other purpose — dissemination of information about boxing, for example — does not receive the special rate? The Kennedy Center, which is subsidized by the Federal Government in the amount of up to $23 million per year, see 20 U. S. C. § 76n(a), is authorized by statute to "present classical and contemporary music, opera, drama, dance, and poetry." § 76j. Is this subsidy subject to strict scrutiny because other kinds of expressive activity, such as learned lectures and political speeches, are excluded? Are government research grant programs or the funding activities of the Corporation for Public Broadcasting, see 47 U. S. C. § 396(g)(2), subject to strict scrutiny because they provide money for the study or exposition of some subjects but not others?

Because there is no principled basis to distinguish the subsidization of speech in these areas — which we would surely uphold — from the subsidization that we strike down here, our decision today places the granting or denial of protection within our own idiosyncratic discretion. In my view, that threatens First Amendment rights infinitely more than the tax exemption at issue. I dissent.