CLEAR CHANNEL OUTDOOR, INC., a Delaware Corporation; Viacom Outdoor Inc., a Delaware Corporation; National Advertising Company, a Delaware Corporation, Plaintiffs,

v.

CITY OF LOS ANGELES; Los Angeles Department of Building and Safety; David R. Heim, in his official capacity as Chief of the Code Enforcement Bureau of the Los Angeles Department of Building and Safety, Defendants.

No. CIV.02–07586 SVW.

United States District Court, C.D. California.

Oct. 30, 2002.

Richard B. Kendall, Laura W. Brill, David C. Codell, Irell & Manella, Los Angeles, for Clear Channel Outdoor Inc., a Delaware corporation, Viacom Outdoor Inc., a Delaware corporation, National Advertising Co., a Delaware corporation, plaintiffs.

Rockard J. Delgadillo, Los Angeles City Attorney's Office, Civil Liability Div., Sherman Oaks, Jeri L. Burge, Los Angeles City Attorney's Office, Police Services, Rockard J. Delgadillo, Los Angeles City Attorney's Office, Police Litigation, Steven N. Blau, Michael L. Klekner, Los Angeles City Attorney's Office, General Counsel Div., Los Angeles, for City of Los Angeles, Los Angeles Department of Building & Safety, David R. Keim, in his official capacity as Chief of the Code Enforcement Bureau of the Los Angeles Department of Building & Safety, defendants.

### ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION.

WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs, Clear Channel Outdoor, Inc., Viacom Outdoor, Inc., and National Advertising Company ("Plaintiffs") seek a preliminary injunction to enjoin the City of Los Angeles ("City") from enforcing the City's "Off–Site Sign Periodic Inspection Program" ("Off–Site Program" or "Program"), which imposes a fee on the owners of off-site sign structures to cover the City's cost of inspecting such structures. Plaintiffs together owe about $1 million in fees, which they are required to pay by October 31, 2002 or they will be required to pay an additional 5% penalty each month the fee remains unpaid.

Plaintiffs argue that the Off–Site Program violates the First Amendment because (1) the Program discriminates against noncommercial speech in favor of commercial speech; (2) the Program discriminates between different types of noncommercial speech based on content; (3) the Program impermissibly discriminates between different types of commercial speech; and (4) the applicable Ordinances are unconstitutionally overbroad and vague.

For the reasons stated herein, the Court GRANTS Plaintiffs' motion for preliminary injunction.

## II. FACTUAL BACKGROUND

The City has building code provisions that regulate exterior signs and sign support structures, which are contained in Chapter IX, Division 62 of the Los Angeles Municipal Code. The stated purpose of these regulations is to promote and protect public safety and traffic safety, as well as the aesthetics of the City. L.A.M.C. § 91.601.1.

The Los Angeles City Council adopted Ordinance No. 174442 in February, 2002, which established an annual inspection program for all off-site signs in the City. The Ordinance required owners of off-site sign structures to obtain an inspection certificate and pay an annual inspection fee. In July, 2002, the City Council enacted Ordinance No. 174736, which established

the "Off–Site Periodic Inspection Fee." A trust fund was set up for deposit of the fees.

An "off-site sign" is defined as "[a] sign which displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial or non-commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where such sign is located." L.A.M.C. § 91.6203. Such off-site signs are subject to fees and reporting requirements under the Program. *See* L.A.M.C. § 91.6205 *et seq.* "On-site signs" are all signs that are not off-site signs. L.A.M.C. § 91.6203. Furthermore, there are approximately 400,000 on-site signs in the City, and 10,000 off-site signs. Declaration of Laura Brill ("Brill Decl."), Ex. C.

Certain requirements in the Code apply to both on-site and off-site signs. For example, a building permit must be obtained for all signs, and there are certain safety regulations that apply to both on-site and off-site sign structures. *See* L.A.M.C. § 91.6205. There are also various size, height and location restrictions that equally apply to all sign structures. *See* L.A.M.C. § 91.6206—91.6218.

The City began a campaign in 2000 to limit the number of billboards by allowing billboard companies to erect one new billboard if the company removed fifteen billboards. *See* Brill Decl., Ex. E. Defendants claim that the various proposals were intended to address the growing problem of illegally constructed or altered signs. *See* Opposition at 3. The initial approach was abandoned, however, and in February, 2002, the City passed Ordinance No. 174442 establishing the Off–Site Program. Ordinance No. 174736, effective September 13, 2002, amended the earlier Ordinance. Ordinances Nos. 174442 and 174736 ("Or-

dinances") together establish the City's Off–Site Program.

Under the new Program, off-site signs (and not on-site signs) are subject to a mandatory annual inspection. *See* L.A.M.C. §§ 91.6205.18.1 & 91.6205.18.4. A person in control of any off-site sign is required to pay an annual fee, the "Off–Site Sign Periodic Inspection Fee," which is set at $314 per sign structure for the 2002–2003 fiscal year. L.A.M.C. § 91.6205.18.2. If the fee is not paid there is a monthly penalty of 5% of any outstanding fees, and if the fee is never paid and the Department determines that the sign is not lawfully erected, "the off-site sign shall have its sign face removed and replaced with blank panels." L.A.M.C. §§ 91.6205.18.2, 91.6202.3. In addition, violators may be subject to criminal penalties. *See* L.A.M.C. § 91.6202.1, 91.6202.2.

Furthermore, the Code has a substitution clause, which states: "No provision of this division shall prohibit an ideological, political or other noncommercial message on a sign otherwise permitted by this division." L.A.M.C. § 91.6201.4. The fee is intended only to cover the cost of inspection. In addition, the Code exempts temporary noncommercial signs. *See* L.A.M.C. §§ 91.6205.18, 91.6201.3.

Plaintiffs are outdoor advertising companies that own and operate outdoor signs in Los Angeles—together, Clear Channel and Viacom control approximately 40% of the 10,00 off-site signs in the City of Los Angeles. Memorandum of Points and Authorities in Support of Motion ("Motion") at 18 n. 5. Clear Channel owns and operates about 1,800 signs and Viacom owns and operates 2,300 signs. *Id.* at 6. Both companies display commercial and non-commercial messages on their signs, including political advertising and public service announcements. *Id.* Clear Channel also displays advertisements for political

candidates and messages related to political issues that the company supports. *Id.*

Defendant David Keim directed both Plaintiffs to pay the $314 fee for each Off-Site Sign Structure. Plaintiffs estimate the fees owed to the City total more than $1 million—more than $500,000 for Clear Channel, and potentially more than $700,000 for Viacom. *Id.* at 6–7. And Plaintiffs will have to pay a 5% monthly penalty for any unpaid amounts as of October 31, 2002. *Id.*

## III. DISCUSSION

### A. *Legal Standard for Preliminary Injunctive Relief*

In the Ninth Circuit, one of two tests must be satisfied for a preliminary injunction to be granted. The traditional test requires "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to the plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Johnson v. California State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir.1995) (citation omitted).

The second test requires the moving party to demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that there exists serious questions regarding the merits and the balance of hardships tips sharply in the movant's favor. *See Metro Pub. Ltd. v. San Jose Mercury News*, 987 F.2d 637, 639 (9th Cir.1993).

Under both of these tests, the moving party "must demonstrate that it will be exposed to some significant risk of irreparable injury." *Associated Gen. Contractors of Cal., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir.1991) (citation omitted), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390

(1992). Furthermore, "[t]he fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [plaintiff's] favor." *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir.2002) (citation and internal quotation marks omitted).

■ The Ninth Circuit explained that "[t]he Supreme Court has made clear that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury for purposes of the issuance of a preliminary injunction." *Id.* (citations and internal quotation marks omitted). In this Circuit, the existence of a "colorable First Amendment claim" is enough to establish irreparable injury." *Id.* (citation omitted). In addition, financial burdens on speech, like outright bans, constitute irreparable injury. *See Jacobsen v. U.S.P.S.*, 812 F.2d 1151 (9th Cir.1987).

### B. *Analysis*

To decide if a preliminary injunction should issue in this case, the Court must determine if a "colorable" First Amendment claim exists. This determination influences both prongs of the preliminary injunction analysis—the likelihood of success on the merits, as well as irreparable harm.

#### 1. Likelihood of success on the merits.

While afforded different degrees of protection, both commercial and noncommercial speech are protected by the First Amendment. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Content-based restrictions on speech are subject to First Amendment scrutiny: "This Court has held time and

again: 'Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'" *Forsyth Cty. v. Nationalist Movement,* 505 U.S. 123, 135, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (citations omitted). The Court further explained that "[s]peech cannot be financially burdened, any more than it can be punished or banned...." *Id.* at 134–35, 112 S.Ct. 2395 (footnote and citation omitted).

■ Content-based restrictions on noncommercial speech are subject to strict scrutiny—the government has the heavy burden of proving that the regulation is narrowly tailored to serve a compelling government interest. *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987).

■ To justify a content-based restriction on commercial speech, the government must satisfy the four-prong *Central Hudson* test: the regulation must (1) concern lawful activity and not be misleading (in other words, the regulation must be protected by the First Amendment); (2) seek to implement a substantial government interest; (3) directly advance that government interest; and (4) reach no further than necessary to accomplish that objective. 447 U.S. at 566, 100 S.Ct. 2343.

Because the Ordinances at issue here burden both commercial and noncommercial speech based on the content of the speech,[1] they must satisfy both levels of scrutiny to withstand this First Amendment challenge.

### a. The Off–Site Program violates the First Amendment because the Ordinances favor commercial speech over noncommercial speech.

■ "[A]n ordinance is invalid [under the First Amendment] if it imposes greater restrictions on noncommercial than on commercial billboards or regulates noncommercial billboards based on their content." *National Advertising Co. v. City of Orange,* 861 F.2d 246, 248 (9th Cir.1988) (citing *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 516, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)) (quoted by *Desert Outdoor Adver., Inc. v. City of Moreno Valley,* 103 F.3d 814, 819 (9th Cir.1996)). Because the Ordinances at issue here favor commercial over noncommercial signs and regulate noncommercial signs based on their content, the Ordinances are invalid.

The Off–Site Program imposes a fee on off-site sign structures only. Off-site signs are defined as "sign[s] which displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial or noncommercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where such sign is located." L.A.M.C. § 91.6203. Thus, a noncommercial sign is more likely to fall within the off-site sign definition, because such signs are less likely than a commercial sign to relate to the site on which the structure is located. For example, a restaurant can erect a sign related to the restaurant (e.g. "Eat at Joe's Café"), but will be subject to the Off–Site fee if

---

1. The Ordinances impose content-based restrictions on speech. While Defendants claim that the Off–Site Program is concerned with the structures and not the signs, in determining whether a structure is off-site or on-site (and thus is subject to the inspection fee), one must analyze the content of the sign. To put it another way, the fee is imposed on sign structures based solely on the content of the sign. While the Court is aware that the determination as to whether a sign structure is off-site or on-site is, for the most part, objective and straightforward, this determination is nonetheless content-based.

the restaurant decides to erect a noncommercial sign, such as "Save the Whales" or "Say No to Drugs."

■ The plurality in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 513, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), explained that the Court's "recent commercial speech cases have consistently accorded noncommercial speech a greater degree of protection than commercial speech." While commercial speech is afforded First Amendment protection, noncommercial speech is higher up on the hierarchy of protected speech, and as such, a regulation cannot afford noncommercial speech less protection than commercial speech.

Courts applying *Metromedia* to invalidate similar ordinances have also held that regulations that favor commercial over noncommercial speech are *per se* violations of the First Amendment. For example, in *Desert Outdoor*, 103 F.3d at 819–20, the Ninth Circuit invalidated an ordinance that allowed on-site structures, which were limited to commercial signs, to be erected in more zones than off-site structures. The court held that such a regulation impermissibly favors commercial over noncommercial speech: " '[T]he fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others.' " *Id.* at 820 (quoting *Metromedia*, 453 at 513, 101 S.Ct. 2882).

Thus, the City's Ordinances, which are more likely to burden noncommercial than commercial speech, violate the First Amendment.[2]

**b. The Ordinances impermissibly differentiate between different types of noncommercial speech based on the content of the signs.**

A regulation cannot burden noncommercial speech based on the content of the speech. In *Desert Outdoor*, the Ninth Circuit explained that the ordinance at issue was content-based because it contained exemptions, which necessarily "require[d] City officials to examine the content of noncommercial off-site structures and signs to determine whether the exemption applie[d].…" 103 F.3d at 820 (citations omitted). Because the city could not show that the ordinance was necessary to achieve a compelling government interest, the ordinance was held to be unconstitutional. Here, too, to determine if a sign structure is on-site or off-site, one must necessarily examine the content of the signs.

Furthermore, the plurality in *Metromedia* held a San Diego ordinance unconstitutional because it distinguished between different types of noncommercial speech based on content: "Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests." 453 U.S. at 514, 101 S.Ct. 2882. The same reasoning used by the plurality in *Metromedia* applies here—"[b]ecause some noncommercial messages may be conveyed on billboards … [the city] must similarly allow billboards conveying other noncommercial messages.…" *Id.*

---

**2.** The substitution clause in the Code does not protect the Program from First Amendment scrutiny. While the substitution clause prohibits the City from banning any form of noncommercial speech, the clause says nothing of the inspection fee, which is what is at issue in this case. Plaintiffs do not argue that the Ordinances prohibit First Amendment speech, and thus, the substitution clause does not affect the Court's analysis.

The Los Angeles Ordinances, like the San Diego ordinance in *Metromedia*, impermissibly burden certain types of noncommercial speech based on content alone. The Ordinances impose a fee on off-site noncommercial sign structures, and the determination as to whether a structure is on-site or off-site depends on the content of the sign. Because "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment[,]" the Off–Site Program is unconstitutional. *See Arkansas Writers' Project*, 481 U.S. at 230, 107 S.Ct. 1722.

Further, Los Angeles has not satisfied its burden of showing that the regulation is narrowly tailored to serve a compelling government interest. In fact, it is unclear at this point what purpose is meant to be served by the Off–Site Program. The Los Angeles Municipal Code states that the purpose of the overall building code provisions is to ensure traffic safety and protect the aesthetics of the City. These same goals failed to satisfy strict scrutiny in *Metromedia*—because certain noncommercial signs were not permitted "regardless of their effect on traffic safety or esthetics[,]" the Court held that the ordinance at issue violated the First Amendment. 453 U.S. at 514–15, 101 S.Ct. 2882.

Thus, if the purpose of the Off–Site Program is to ensure traffic safety and to protect the aesthetics of the City, the Ordinances do not survive strict scrutiny. After all, imposing a fee on certain sign structures based on the content of the sign (as opposed to the location or size of the structure), will do nothing to ensure the public safety or improve the aesthetics of the City. And even if the Program did advance the City's goals, the Program is not narrowly tailored to meet these goals.

Furthermore, at the hearing held on October 28, 2002, Defendants explained that the Off–Site Program was instituted because of certain complaints the City has received regarding off-site structures that are not up to code. Defendants' Opposition alludes to this goal, as well: "Over the past several years numerous proposals were presented to the City Council to address the growing problem of illegally constructed or altered billboards." Opposition at 3. The City, however, has failed to show whether off-site structures are more likely to violate the Code or even whether this is a problem at all. In fact, because off-site sign structures comprise a mere 2.5% of the City's outdoor signs, and because Plaintiffs point out that Defendant Keim admitted that about 60,000 on-site structures are illegally constructed or altered, the City has failed to show that the Program is narrowly tailored to serve such a compelling government interest.

### c. The Program impermissibly discriminates between different types of commercial speech.

■ Among other things, the government must demonstrate that a regulation that burdens commercial speech directly and materially advances a substantial government interest. *See Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343 (holding that there are four requirements that must be satisfied to determine if a regulation that burdens commercial speech is constitutional: (1) the regulation must concern lawful activity and not be misleading; (2) the regulation must seek to implement a substantial government interest; (3) the regulation must directly advance that government interest; and (4) the regulation must reach no further than necessary to accomplish that objective).

The first factor of the *Central Hudson* test is not at issue—the regulation concerns a lawful activity and is not misleading. Thus, the starting point of this

analysis is the government's purpose in instituting the Off–Site Program. As stated above, it is unclear what interest the government is attempting to further. The Court thus will look at both possibilities: the interest in traffic safety and aesthetics, and the interest in ensuring that signs are legally constructed.

The *Metromedia* plurality held that the city's goals of improving traffic safety and the aesthetics of the city were substantial government interests. 453 U.S. at 507–8, 101 S.Ct. 2882. The Court went on to state: "If the city has a sufficient basis for believing that the billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows outside advertising and some other specifically exempted signs." *Id.* at 508, 101 S.Ct. 2882.

Here, however, the Ordinances are not the most direct approach to solving the City's problems. The Ordinances do not prohibit signs, but rather impose a fee on certain signs and not others. This fee will do nothing to improve the aesthetics of the City or traffic safety because the off-site sign structures do not have to be removed. Furthermore, off-site sign structures comprise only 2.5% of the City's outdoor sign structures. *See* Brill Decl., Ex. C. Imposing a fee to inspect such a small percentage of the City's signs will not materially and directly advance the City's interests.

In fact, in *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Court struck down an ordinance that required the removal of newsracks that dispensed commercial handbills. The Court held that the city failed to meet its burden that the ordinance would directly advance the city's interest in safety and aesthetics—because there were only 62 newsracks that dispensed commercial handbills, while there were between 1,500 and 2,000 newsracks that dispensed newspapers, the benefits derived by the ordinance were "minute" and "paltry." *Id.* at 418, 113 S.Ct. 1505.

Here, as in *Discovery Network*, it is the on-site signs that are the "greater culprit." *See id.* at 426, 113 S.Ct. 1505 ("[T]he city's primary concern, as argued to us, is with the aggregate number of newsracks on its streets. On that score, however, all newsracks, regardless of whether they contain commercial or noncommercial publications, are equally at fault. In fact, the newspapers are arguably the greater culprit because of their superior number."). And as in *Discovery Network*, the City of Los Angeles's Ordinances cannot be said to materially advance the City's interest—whether the goal of the Program relates to public safety, aesthetics, or ensuring legally-constructed signs.

In addition, the City's concern with "the growing problem of illegally constructed or altered billboards" does not appear to apply only to off-site structures. *See* Opposition at 3. Thus, the Ordinances do not directly or materially advance any interest(s) the City may seek to protect. If anything, on-site structures should be targeted because they comprise 97.5% of the City's sign structures.

While Defendants argue otherwise, there is no denying that Plaintiffs have presented at least a "colorable" argument that the Off–Site Program, which burdens commercial speech, does not satisfy the *Central Hudson* test and thus is unconstitutional.

### d. The Ordinances are unconstitutionally vague and overbroad.

Plaintiffs also attack the ordinances on vagueness and overbreadth grounds.

Plaintiffs cite *City of Chicago v. Morales,* 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (citations and internal quotation marks omitted), to argue that the Ordinances violate the Constitution because the Off–Site Program is both overbroad—"the impermissible applications of the law are substantial when judged in relation to the [regulation's] plainly legitimate sweep"—and vague—"it fails to establish standards for the [enforcement authorities] and public that are sufficient to guard against the arbitrary deprivation of liberty interests."

While the Court is not convinced that the Ordinances are overbroad, the Court is satisfied that they may be unconstitutionally vague. For example, if a restaurant erects a sign that states: "Joe's Café supports the City's no-smoking laws," it is unclear if such a sign would be considered on-site or off-site. The restaurant may simply be making a political statement, or the restaurant may be promoting itself to non-smoking diners, or both. As the *Morales* Court held, a law must provide notice to the public as to what speech it covers. 527 U.S. at 56, 119 S.Ct. 1849. Here, it is unclear that the Off–Site Program provides such notice—there are instances where a sign may contain more than one message or image and therefore make it difficult to determine if such a sign is on-site or off-site.

The examples given by Plaintiffs are also instructive. For example, is a sign at a bookstore that states, "Subscribe to the Los Angeles Times," when that newspaper is sold at the store, an off-site or on-site sign? And are signs at a health food store that state "Support Organic Farmers" or "We Support Organic Farmers" off-site or on-site signs?

Plaintiffs have presented a "colorable" First Amendment argument that the Ordinances are vague. While the Court is cognizant that many signs are easy to categorize, the Court is also aware that these hypothetical examples are real possibilities and raise serious First Amendment concerns.

### 2. Irreparable harm.

Because the analysis above raises serious questions regarding the constitutionality of the Off–Site Program, Plaintiffs will suffer irreparable harm in this case. In addition to the $1,000,000 in fees owed by the Plaintiffs (which does not constitute irreparable harm in and of itself), "[t]he Supreme Court has made clear that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury for purposes of the issuance of a preliminary injunction." *Sammartano,* 303 F.3d at 974. Here, the burdens on protected First Amendment speech compel a finding of irreparable injury—Plaintiffs have a presented more than a colorable First Amendment claim and thus a preliminary injunction is warranted in this case.

As the Ninth Circuit explained, "[b]ecause the test for granting a preliminary injunction is a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness, when the harmed claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness." *Id.* (citation and internal quotation marks omitted). Here, Plaintiffs have claimed both a serious infringement on their First Amendment freedoms and a strong showing on the merits.

Furthermore, the balance of hardships tips in Plaintiffs' favor. After all, the Plaintiffs' interest in First Amendment freedoms—and the public's interest in such rights—weighs in favor of granting the preliminary injunction. The only hardship the City will suffer is lost reve-

nue, which can be recouped if the Ordinances are ultimately found to be constitutional. "The fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [plaintiff's] favor." *Id.* This certainly is the situation here.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is GRANTED.

Defendants and their directors, officers, agents, affiliates, subsidiaries, servants, employees, and all other persons or entities in active concert or privity or participation with them are restrained or enjoined, during the pendency of this action, from directly or indirectly enforcing or implementing Los Angeles City Ordinances Nos. 174442 and 174736, codified at Los Angeles Municipal Code §§ 91.6205.18 *et seq.*, including:

(a) initiating, conducting, or enforcing mandatory inspections of the off-site signs pursuant to the Ordinances;

(b) enforcing, collecting, or demanding payment of any annual fees for off-site sign structures pursuant to the Ordinances;

(c) enforcing or otherwise implementing demands for permit documentation relating to off-site signs pursuant to the Ordinances; and

(d) implementing or enforcing any penalties for noncompliance with the Ordinances.

This preliminary injunction shall remain in effect until further order of this Court.

IT IS SO ORDERED.