**SOUTH CAROLINA EDUCATION ASSOCIATION, Nelle H. Taylor, Betty Jean Cunningham, and Michael T. Hollifield, Plaintiffs,**

**v.**

**John T. CAMPBELL, in his official capacity as Secretary of State of South Carolina; Carroll Campbell, in his official capacity as Governor of the State of South Carolina; and Earle Morris, in his official capacity as Comptroller General of the State of South Carolina, Defendants.**

Civ. A. No. 3:87–2838–0.

United States District Court,
D. South Carolina,
Columbia Division.

Aug. 10, 1988.

Richard Mark Gergel, Cynthia Hall Ouzts, Gergel, Burnette, Nickles, Grant & Ouzts, P.A., Columbia, S.C., Leon Friedman, New York City, for plaintiffs.

Charles P. Roberts, Richard B. Kale, Jr., and James B. Spears, Jr., Haynsworth, Baldwin, Miles, Johnson, Greaves and Edwards, Greenville, S.C., for defendants.

PERRY, District Judge.

This action involves a challenge by plaintiffs, the South Carolina Education Association ("SCEA") and various members of the SCEA, to a statutory scheme[1] they assert was designed to deny the SCEA payroll deduction benefits because of the content of the organization's speech-related activities, while permitting a similarly situated employee organization, the South Carolina State Employees Association ("State Employees Association"), to enjoy such payroll deduction benefits. Plaintiffs assert that this differential treatment on the

1. South Carolina Code Section 8–11–83, 8–11–91 to 98.

basis of the content of the SCEA's speech-related activities is violative of their rights under the First and Fourteenth Amendments of the United States Constitution. The Court tried this matter without a jury and makes the following finding of fact and conclusions of law.

## FINDING OF FACT

1. The SCEA is an unincorporated association of teachers, school administrators, guidance counselors, teacher aides and other educational personnel. All public school employees, from the superintendent to the custodian, are eligible for SCEA membership. The SCEA is classified under federal tax law as a "business league" under 26 U.S.C. § 501(c)(6).

2. The SCEA is an affiliate of the National Education Association ("NEA"), a Washington, D.C. based organization which was organized under a charter issued by the United States Congress. Under the rules of the SCEA, a person desiring to join the state organization must also join a local affiliat and the NEA. The NEA is classified under federal tax law as a "labor organization" under 26 U.S.C. § 501(c)(5).

3. Prior to June 30, 1981, the SCEA collected a substantial portion of its dues through voluntary payroll deductions from approximately two-thirds of the school districts in South Carolina. The SCEA had a membership in excess of 18,000 during the 1980–81 school year.

4. The SCEA has been actively engaged in the political arena in recent years, advocating a broad range of legislative initiatives and endorsing through its political action committee candidates for state and federal legislative and executive offices. Some of the organization's positions, such as its advocacy of a change in the State's public policy against collective bargaining in the public sector and for adoption of the Equal Rights Amendment, have been considered controversial by some members of the South Carolina General Assembly.

5. In November 1979 the Attorney General of South Carolina concluded that no public body could provide voluntary payroll deductions witⱨ out statutory authorization. The Attorney General's opinion, which had no binding effect, did not result in any significant change in the long standing practices of school districts of providing payroll deduction benefits for SCEA dues.

6. In order to secure its long-standing use of payroll deduction benefits, the SCEA sought legislative authorization for payroll deduction in 1980. The proposal, which provided for payroll deduction for "professional associations," received approval from the Senate Education Committee. The bill faced serious opposition on the Senate floor, however. In the course of the extended Senate debate during the 1980 legislative session, which included a filibuster by Senator John Drummond for over 20 hours, the SCEA found itself the focus of repeated attacks on its legislative agenda, its affiliation with the NEA and its leadership. During his remarks on the floor of the Senate, Senator Drummond read extensively from SCEA publications, attacked the practices and philosophy of the NEA and made personal references to the SCEA's Executive Director and Assistant Executive Director. Senator Charles Garrett criticized the SCEA's affiliation with the NEA and characterized the SCEA as a liberal organization and labor union. Senator Gilbert McMillan suggested in the floor debate that because of the organization's philosophy, its president, Mrs. Elaine Marks, should spell her name "Marx." After extensive consideration of the matter, the Senate voted on April 29, 1980 to authorize voluntary payroll deduction of professional association dues. The matter was then sent to the House where, because of the lateness in the session, no action was taken on the bill before the General Assembly adjourned.[2]

7. Prior to the opening of the 1981 General Assembly, South Carolina Comptroller General Earle Morris announced that if the General Assembly did not promptly provide

---

**2.** Since the 1980 legislative session was the end of a two year legislative cycle, the payroll deduction legislation died upon adjournment and any further legislation was required to begin anew in the House and the Senate in 1981.

statutory authorization for payroll deductions he would cease withholding unauthorized voluntary deductions from State employee paychecks. Although SCEA payroll deduction benefits were not directly affected by the Comptroller General's threatened action,[3] other non-profit organizations, such as United Way and Good Health Appeals, faced imminent injury. In December 1980, bills were prefiled in the House and Senate which authorized by name the United Way and Good Health Appeal for payroll deduction benefits.

8. The bill authorizing payroll deduction for the United Way and Good Health Appeal by name came to the floor of the House in late January 1981 and an effect was made to amend the bill to authorize payroll deduction for professional associations. This amendment triggered a filibuster by Rep. Larry Koon, who, reading from SCEA and NEA materials on the floor of the House, criticized the state association's affiliation with with the NEA. During his extended remarks, Rep. Koon attacked the NEA's advocacy of collective bargaining and "liberal" politics and criticized the requirement that a member of the SCEA also join the NEA.

After extended debate, the House adopted an amendment authorizing voluntary deductions for professional association dues. Immediately thereafter, another amendment was offered by Rep. Thomas Marchant which prohibited payroll deduction benefits for any entity "classified as a labor organization" under federal tax or labor law or which would permit the proceeds of payroll deduction to be forwarded to a labor organization. Rep. Marchant explained during the floor debate that it was his intention to deny payroll deduction benefits to the NEA, which is recognized as a labor organization under federal labor and tax laws, as well as the SCEA, which forwarded a portion of the proceeds of payroll deduction to the NEA. In the course of his remarks, Rep. Marchant attacked the SCEA's "liberal" political philos-

ophy, characterized the organization as a labor union and read from the organization's literature. The House thereafter adopted the Marchant Amendment.

The House's adoption of both the Marchant Amendment and voluntary payroll deduction for professional associations created some confusion regarding whether the SCEA would be eligible for payroll deduction benefits. While the bill was still before the House and a filibuster was ongoing, Rep. Merchant wrote South Carolina Attorney General Daniel McLeod on January 30, 1981 requesting an Attorney General's opinion regarding the effect of his amendment. Rep. Marchant explained that the payroll deduction bill had been debated for two weeks "with a major point of concern being opposition to deductions for the South Carolina Education Association." He further explained that "a new filibuster" was underway by supporters of his amendment "to prevent any deductions going to the SCEA and/or NEA." Attorney General McLeod responded to the opinion request on February 2, 1981, concluding that if SCEA forwarded a portion of its payroll deduction proceeds to the NEA, then "deductions for such payments by school districts to the SCEA would be prohibited...." Rep. Marchant filed this Attorney General's opinion in the House Journal on February 3, 1981 and proponents of the Marchant Amendment immediately relinquished the House floor. The payroll deduction legislation then was adopted by the full House.

9. After House passage of the payroll deduction bill, Rep. Marchant maintained his active interest in SCEA activities. On April 21, 1981, Rep. Marchant wrote then Secretary of Treasury Donald Regan to request a review of SCEA's tax exempt status under 501(c)(6) as a "business league." Rep. Marchant argued, utilizing SCEA literature and various news articles, that the organization should be classified under 501(c)(5) as a "labor organization."

---

**3.** SCEA did not have payroll deduction benefits at that time for its members who were State employees, such as teachers at the South Carolina Department of Youth Services school system, Department of Mental Retardation education facilities and the South Carolina School for Deaf and Blind.

The letter was signed by Rep. Marchant as "Assistant Minority Leader" and was hand delivered by Rep. Marchant while he was in Washington for a meeting at the White House. Shortly thereafter, an official of the Internal Revenue Service appeared at the SCEA building to review the organization's tax exempt status. No change in the organization's status was made after internal Revenue Service review.[4]

10. After the House passed payroll deduction legislation, the Senate took up consideration of the bill. The key floor leader for the United Way and Good Health Appeal payroll deduction in the Senate, Senator Heyward McDoland, redrafted the bill in committee for the purpose of creating a neutral piece of legislation than would allow payroll deduction for the United Way, Good Health Appeal, credit unions and other financial institutions.[5] The McDonald bill contained a mandatory six part test which had the effect of disqualifying the SCEA from payroll deduction benefits. Senator McDonald explained that the opponents of payroll deduction for the SCEA in the Senate were sufficiently strong that if he did not accommodate their wishes the entire bill, including payroll deduction for the United Way and Good Health Appeal, would be defeated.

11. The Senate Medical Affairs Committee took up consideration of Senator McDonald's redrafted bill, S.153. Proponents of payroll deduction for professional associations sought to amend the bill in committee, which sparked a serious debate. Senator Arthur Ravenel, referencing the SCEA's Charleston affiliate's activities in his 1980 Senate race, described in committee debate the organization as "vicious" and vigorously argued against payroll deductions for the SCEA. Senators Glen McConnell and Norma Russell also criticized the SCEA during the committee debate. The amendment to authorize payroll deduction for professional associations failed in committee by a 7–7 tie.

12. When the bill went onto the Senate floor, Senator Rembert Dennis offered amendments to the bill to permit either voluntary payroll deduction or the grandfathering of all school districts that had permitted payroll deduction in the past. In the course of the Senate consideration of the Dennis Amendments, the SCEA, its national affilliate and its leadership were subjected to repeated attacks. During the debate, a tabloid published by the SCEA that identified certain senators for defeat was circulated on the Senate floor and referenced in the debate. An opponent of SCEA payroll deduction, Senator Glenn McConnell, described the tabloid as "exciting" the SCEA opposition.

Senator John Drummond actively participated in the debate by reading from SCEA literature and attacking the organization's affiliation with the NEA. Senator Norma Russell criticized the SCEA's then Executive Director, Dr. John Sullivan, for his salary, which she apparently misinterpreted while reading from the SCEA budget during Senate debate. She also criticized the Association's political endorsement practices and its support of the Equal Rights Amendment. Senator Marion Gressett criticized the SCEA for its affiliation with the NEA.

The Senate ultimately defeated each Dennis amendment by narrow margins. The bill was then amended to include a prohibition of payroll deduction for any organization that provided direct legal advo-

---

4. Under the House version of the payroll deduction bill, adopted on February 3, 1981, an organization classified as a "labor organization" under 501(c)(5) of the IRS code was ineligible for payroll deduction. Since the SCEA was classified as a "business league" under 501(c)(6), it would be ineligible for payroll deduction benefits under the House bill only if it forwarded a portion of the proceeds of payroll deduction to the NEA, a 501(c)(5) organization. If Rep. Marchant had been successful in obtaining a reclassification of SCEA as a 501(c)(5) organization, it would have automatically made the organization ineligible for payroll deduction benefits under the House bill, regardless of whether the NEA shared in the payroll deduction proceeds.

5. An Attorney General's opinion issued January 13, 1981 had raised "serious reservations" regarding the constitutionality of the provisions allowing two organizations to receive "payroll deductions, but excluding all other organizations without exception."

cacy services to its members.[6] S.153 was then given a third reading and sent to the House.

13. The House refused to concur with the Senate bill and a conference committee of Senators Hyman Rubin, Heyward McDonald and Paul Cantrell and Reps. Tom Marchant, Parker Evatt and Ernest Nunnery was appointed.

14. Although payroll deduction for professional associations had been defeated in both the House and Senate, supporters of the SCEA found the Senate bill contained a provision which potentially permitted SCEA to continue payroll deduction through credit unions.[7] The Conference Committee voted 5–1 to adopt the Senate version of the bill. Rep. Marchant argued that the Senate bill contained a loophole regarding credit union deductions and required the Marchant Amendment to prevent further SCEA payroll deductions. Upon the Conference Committee's rejection of the Marchant Amendment, Rep. Marchant filed a minority report stating that he desired to "insure, without a question, that none of the dues could benefit a labor union."

15. Rep. Marchant urged from the House floor rejection of the Conference Committee report because the absence of his amendment created a loophole for the SCEA. The House thereafter rejected the Conference Report. Senator Norma Russell also urged the Senate to reject the Conference Report, noting that the SCEA's Greenville affiliate collected a substantial portion of its dues through the local teacher's credit union. Senator McDonald argued for acceptance of the Conference report, asserting that there was already "ten nails in the SCEA coffin" and opponents sought simply to put "thirty screws" in it. The Senate also rejected the first Conference report.

16. The conferees reconvened and adopted a second Conference report, which contained the Senate bill and a portion of the Marchant Amendment which prohibited direct payments to a labor organization. The other portion of the Marchant Amendment, prohibiting payments to any organization which forwarded proceeds of payroll deduction to a labor organization, was not included in the Conference report.[8] Rep. Marchant again dissented from the Conference report and the House rejected the second Conference report at Rep. Marchant's urging. The conferees then reconvened, adopted as the third Conference report the Senate bill with the full Marchant Amendment and forwarded the report to the House and Senate. The legislation, thereafter, passed both bodies by large margins and was signed into law by the Governor.

17. As a result of the 1981 legislative action and pursuant to the provisions of the adopted statutes, all school districts which have previously provided payroll deduction to the SCEA terminated the practice.[9] The

6. At that time the SCEA was the sole state-wide organization providing ongoing legal advocacy services for its members.

7. The House bill also contained a provision for credit unions but the addition of the Marchant Amendment made that provision unusable for the SCEA. Several local affiliates of the SCEA collected their dues through local teacher credit unions, including the Greenville and Charleston affiliates.

8. An Attorney General's report of June 1, 1981 had raised questions concerning the constitutionality of this portion of the Marchant Amendment.

9. The termination of payroll deduction benefits for the SCEA was based upon the failure of the organization to satisfy the six part test of the statute, which provides:

A. Nonprofit it charitable organizations for which such payroll deductions may be made shall include any nonprofit, eleemosynary corporation, association or organization which is organized and operated exclusively for charitable, health or welfare services to the public and meets all of the following qualifications:

1. Is and continues to be organized and qualified to solicit and operate under the laws of this State, pursuant to Chapter 55 of Title 33;

2. Provide direct and continuing services to or on behalf of the citizens of the State. For purposes of this section, "direct and continuing service" means: (a) services other than legal services which are provided directly to and specifically for one individual or one family; or (b) services which are in the nature of medical research; or, (c) services which involve the collection and administra-

SCEA suffered a sudden drop in its membership, losing in excess of 3,500 members the year following the loss of payroll deductions. This significant single year decline in membership was primarily caused by the loss of payroll deduction benefits.

The SCEA's significant membership loss in the 1981–82 school year created a fiscal crisis for the organization, requiring the laying off of staff, reducing the remaining staff temporarily to a four day work week and limiting various meetings and instructional conferences. Further, the SCEA's publications were reduced and its legal advocacy program's budget was cut. The SCEA's fiscal instability required its lender to insist on a second mortgage on the SCEA building and the organization was forced into borrowing funds at 21% interest to remain afloat. The SCEA's professional staff, which had previously devoted significant time to handling employee grievances and providing other services to members, were forced to devote their primary energies to maintenance of membership.

18. The South Carolina State Employees Association is an organization of State employees which, like the SCEA, lobbies the South Carolina General Assembly regarding matters of concern to its members and provides various services to its membership, including assistance in employee grievance matters. The State Employees Association has tended, however, to be a less controversial organization than the SCEA, has not endorsed candidates for public office and has not affiliated with a national organization identified as a labor union. The State Employees Association is classified under federal tax law as a labor organization pursuant to 26 U.S.C. § 501(c)(5).

19. The leadership of the State Employees Association realized prior to the 1985 legislative session that it was experiencing a chronic problem maintaining its membership and would be greatly benefited by the provision of payroll deductions. Under the then existing statutory scheme, the State Employees Association was ineligible for payroll deductions.

The State Employees Association persuaded supportive legislators to propose an amendment to the 1985 Appropriations Act, which would authorize payroll deductions by name to the organization. The provision was approved by the House and forwarded to the Senate. In the course of the Senate debate, an amendment was proposed by Senator John Courson, which provided that in the event the State Employees Association engaged in collective bargaining or advocated a strike, payroll deduction benefits would be terminated. The Courson Amendment resulted in a 21–21 tie, with Lt. Governor Michael Daniel breaking the tie in favor of the amendment. The proviso was then approved by the Senate.

Two senators and one House member who supported payroll deductions for the State Employees Association but opposed the benefit for the SCEA acknowledged at trial that the differential treatment afforded was content-based. Arthur Ravenel, a State Senator during legislative consideration of payroll deduction and now a United States Congressman, testified that he supported payroll deduction for the State Employees Association because unlike the SCEA, it was not a labor union and did not engage in political action and endorsement of candidates. Senator Glenn McConnell testified that he supported the effort of the

tion of funds by umbrella organizations for other organizations, all of which qualify under this act;
3. Is recognized as tax exempt under Section 501(c)(3) of Title 26, United States Code (the Internal Revenue Code of 1954, as amended);
4. Is not an organization contemplated by Section 501(c)(4), 501(c)(5) or 501(c)(6) of Title 26, United States Code (the Internal Revenue Code of 1954, as amended) and is not an organization primarily engaged in the propagation of a religious faith or belief; this prohibition shall include, but not be limited to,
organizations primarily engaged in lobbying or political activity;
5. Is operated without discrimination in regard to all persons served, and complies with all requirements of law, including administrative regulations, respecting nondiscrimination and equal opportunity regarding its officers, staff, employees and volunteers;
6. Has neither a parent organization nor a subsidiary organization which fails to meet qualifications herein contained in items (1) through (5).

State Employees Association because it did not affiliate with a union or advocate collective bargaining and was not a political activist organization. He also explained that by providing financial stability through payroll deduction the State Employees Association would not be driven into becoming a union advocating collective bargaining. Senator McConnell also testified that it was in his mind in 1985 not to allow any language in the proviso to permit payroll deduction for the SCEA. Rep. Larry Koon testified that he supported payroll deduction for the State Employees Association because, unlike the SCEA, the organization was not affiliated with a labor union.

20. The 1985 proviso to the Appropriations Act expired at the end of the 1985–86 fiscal year and was renewed with little discussion in the 1986 Appropriations Act. The proviso was also inserted in the proposed 1987 Appropriations Act but was struck by the Speaker of the House because it was non-germane to the appropriations process. Supporters of payroll deduction for the State Employees Association then drafted an independent piece of legislation, which was given special order consideration by the House Rules Committee and quickly passed the House. The Senate took up the bill without reference to a committee and approved it with little controversy. Governor Campbell allowed the bill to become law without his signature, explaining in a letter to the Speaker of the House that while he opposed payroll deductions for public employees, the State Employees Association "has been a responsible organization" whose members "want

a positive, cooperative employee-employer relationship." The Governor went on to state, however, that "without equivocation" he would "look with great disfavor on any new legislation in this area." [10]

21. When the General Assembly adopted the 1981 payroll deduction legislation, the SCEA was the sole employee organization which was then seeking to utilize the benefit. With the provision of payroll deduction benefits to the State Employees Association in 1985, the SCEA is today the only state-wide public employee organization within South Carolina which seeks to obtain payroll deductions and is denied the benefit. Since obtaining payroll deductions benefits in 1985, the State Employees Association has realized a significant increase in its membership.[11]

## CONCLUSIONS OF LAW

1. This case concerns the right of the government to withhold a benefit—payroll deduction—on the basis of the identify or political viewpoint of the potential beneficiary.[12] The United States Supreme Court has long held that any effort to regulate or sanction citizens on the basis of the content of their speech is inherently suspect:

> If there is any fixed star in our constitutional constellation it is that no official, high or low, can proscribe what shall be orthodox in politics, nationalism, religion or other matters of opinion or force citizens to confess by word or act their faith therein. *West Virginia State Board of*

---

10. The 1987 legislation, codified as South Carolina Code Section 8–11–83, provides as follows: The Comptroller General and all other State agencies, upon request of employees of the State, shall make deductions from the compensation of the employees for the payment of membership dues for the South Carolina State Employees Association. The Comptroller General and State agencies shall pay over to the Association all amounts so collected or withheld. Retirees from a State agency also may have withheld from their State retirement benefits their membership dues for the South Carolina State Employees Association. No deduction is permitted if the Association at any time engages in collective bargaining or encourages its members to strike.

11. Under the State's statutory scheme for payroll deductions, over 80 organizations, ranging from tax sheltered annuities to credit unions to the South Carolina State Employees Association to various insurance companies, are permitted payroll deduction from State employees paychecks.

12. It is well settled that plaintiffs have no constitutional right to payroll deduction benefits, even in those circumstances where some injury arises to the organization from the simple denial of the benefit. *City of Charlotte v. Local 660 International Association of Firefighters,* 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976).

*Education v. Barnette,* 319 U.S. 624, 642 [63 S.Ct. 1178, 1187, 87 L.Ed. 1628] (1943).

This basic principle, that governmental officials are not free to use their power to impose a burden or deny a benefit for content-based reasons, was recognized in *Grosjean v. American Press Company,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). In *Grosjean,* the State of Louisiana enacted a license tax on all newspapers with weekly circulations exceeding 20,000. In the course of legislative debate, supporters of the bill accused the affected newspaper of having "ganged up" on the U.S. Senator Huey long, characterized the papers as "lying newspapers," and asserted that the tax would be "a tax on lying, 2c [cents] a lie." *Minneapolis Star and Tribune Company v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 579–80, 103 S.Ct. 1365, 1368–1369, 75 L.Ed.2d 295 (1983).[13] The Court, finding no general prohibition or constitutional right of newspapers to be free from taxation, nevertheless rejected the tax motivated by the content of the newspapers' speech:

> The tax here is bad not because it takes money from the pockets of the [newspapers]. If that were all, a wholly different question would be presented. It is bad because, in light of its history and its present setting, it is seen as a deliberate and calculated device in *the guise of a tax* to limit the circulation of information to which the public is entitled ... 297 U.S. at 250 [56 S.Ct. at 449]. [Emphasis added].

The Supreme Court has affirmed its abhorrence of content-based governmental action in a long line of decisions. In *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951), the Court rejected a Park Commissioner's denial of a permit to Jehovah Witnesses due to the content of their speech, holding that "the First and Fourteenth Amendments [have] a firmer foundation than the whims of personal opinions of a local governmental body." 340 U.S. at 272, 71 S.Ct. at 328. In *Police*

*Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), the Court struck down a City of Chicago ordinance which prohibited all forms of picketing in or about a school building except for labor picketing. The Court reasoned:

> The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter. Peaceful picketing on the subject of a school's labor management dispute is permitted, but all other peaceful picketing is prohibited. The operative distinction is the message on a picket sign. But, above all else, *the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content.* To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from governmental censorship. The essence of this forbidden censorship is content control. Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open." 408 U.S. at 95–6, 92 S.Ct. at 2289–2290. [Citation omitted].

See *also, Regan v. Time, Inc.,* 468 U.S. 641, 648–9, 104 S.Ct. 3262, 3266–3267, 82 L.Ed. 2d 487 (1984); *Arkansas Writer's Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *FCC v. League of Women Voters of California,* 468 U.S. 364, 383–4, 104 S.Ct. 3106, 3119–3120, 82 L.Ed.2d 278 (1984); *Minneapolis Star and Tribune Company v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1973); *Consolidated Edison Company v. Public Service Commission,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).

13. The Supreme Court in *Minneapolis Star* analyzed the record in *Grosjean* closely and much of the factual background was only referenced generally in the *Grosjean* order itself.

The Supreme Court addressed in a 1985 decision, *Cornelius v. NAACP Legal Defense Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the withholding of payroll deduction benefits for charitable contributions by the government to an organization for content-based reasons. In *Cornelius*, the Supreme Court was confronted with the denial of payroll deduction benefits for a charitable organization allegedly on the basis of the content of the NAACP Legal Defense Fund's speech-related activities. The Court, after concluding that the government asserted a reasonable basis to deny payroll deduction in a non-public forum independent of protected conduct, remanded the case to determine if the regulation was "in reality a facade for viewpoint based discrimination." 473 U.S. at 812–813, 105 S.Ct. at 3454–3455. Justice O'Conner, writing for the majority, held that the government's reasonable justification for denial of payroll deduction "cannot save an exclusion that is in fact based on the desire to suppress a particular point of view." *Ibid.*

The *Cornelius* Court relied on dicta in a previous case, *Perry Education Association v. Perry Local Educators Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), which involved the granting of teacher mailbox and inter-school mail privileges exclusively to one employee organization because of its recognition as a bargaining representative for collective bargaining purposes. A rival organization, which had lost the representation election, contended that it was denied equal protection and free speech due to the employer's action. In the course of holding that exclusive payroll deduction benefits for the bargaining representative was not violative of the Constitution, the Court carefully distinguished this situation from one where the denial was viewpoint based. 460 U.S. at 46–49, 103 S.Ct. at 955–957.

The prohibition against content-based governmental action is not limited to circumstances where the injured party had a constitutional right to the benefit withheld. In *Cornelius*, the Supreme Court held that even though the NAACP Legal Defense Fund had no constitutional right to charita-

ble solicitation in a non-public forum, the denial of access could not in reality be facade for viewpoint based discrimination. 473 U.S. at 812–13, 105 S.Ct. at 3454–3455. Similarly, in various cases involving the taxing of newspapers, the Supreme Court has affirmed the government's general right to raise revenues through the taxing of newspapers and periodicals. *E.g., Minneapolis Star and Tribune Company v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). Despite the newspapers' absence of First Amendment protection against general taxation, the Court has consistently held content-based taxes to be unconstitutional. Indeed, the United States Supreme Court recently held in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), that a State tax applicable only to periodicals that were not of a religious, professional, trade or sports nature, constituted unlawful content-based discrimination.

In summary, the withholding of a benefit or the imposition of a burden for content-based reasons by the government is violative of the First and Fourteenth Amendments of the United States Constitution. This constitutional violation exists even in circumstances where the injured party has no legal right to the benefit or to be free from the burden imposed.

■ 2. Once it is established that government action withholding a benefit or imposing a burden is content-based, "strict scrutiny" analysis must be applied. This requires a showing that the treatment afforded the affected party "is necessary to serve a compelling state interest and is narrowly drawn to serve that end." *Arkansas Writer's Project v. Ragland*, 107 S.Ct. at 1728; *Minneapolis Star and Tribune Company v. Minnesota Commissioner of Revenue*, 460 U.S. at 585, 103 S.Ct. at 1371–1372; *Consolidated Edison Company v. Public Service Commission*, 447 U.S. at 540, 100 S.Ct. at 2334.

3. The Supreme Court has also addressed the denial of a government benefit, food stamps, to a politically unpopular

group ("hippies" living in communes) under a Fourteenth Amendment analysis in *United States Department of Agriculture v. Mareno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). The Supreme Court, in seeking to identify a legitimate governmental interest to support the classification contained in the statute, held that "if the constitutional concept of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest. 413 U.S. at 534, 93 S.Ct. at 2825–2826.

4. The determination of whether this statutory scheme is, in fact, "a facade for viewpoint based discrimination," *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. at 812–13, 105 S.Ct. at 3454–3455, requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). While the injury is practical, the Court must look to "objective factors," such as:

a. Contemporaneous statements by members of the decision-making body;

b. Impact of the governmental action;

c. Legislative history, including reports, opinions, statements asserted into the record at the time of legislative consideration and various drafts of the legislation;

d. Sequence of events leading to the final action;

e. Examination of the statutory language; and

f. Testimony of members regarding the purpose of their action, although post-enactment elucidation of the meaning of the statute for purposes of justifying the action is given little weight.

*Edwards v. Aguillard*, —— U.S. ——, 107 S.Ct. 2573, 2579–82, 96 L.Ed.2d 510 (1987); *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Personnel Administrator of Massachusetts v. Feeney*,

442 U.S. 256, 279 n. 24, 99 S.Ct. 2282, 2296 n. 24, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. at 267–9, 97 S.Ct. at 564–5; *United States v. City of Birmingham, Michigan*, 727 F.2d 560, 564 (6th Cir.1984); *McMillan v. Escambia County, Florida*, 638 F.2d 1239, 1243 (5th Cir.1981); *Brown v. Board of School Commissioners of Mobile County Alabama*, 542 F.Supp. 1078, 1104 (S.D.Ala.1982); *United States v. City of Parma, Ohio*, 494 F.Supp. 1049, 1054 (N.D.Ohio 1980).

5. In attempting to establish the presence of a content-based governmental action, plaintiffs need not show that the decision was "motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. at 265, 97 S.Ct. at 563. It is sufficient to establish the presence of content-based considerations if the plaintiff shows that such were "a motivating factor in the decision." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. at 265, 97 S.Ct. at 563; *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296 (plaintiff must show that the legislature acted "at least in part" for the purpose of accomplishing the adverse effects); *United States v. City of Parma, Ohio*, 494 F.Supp. at 1054.

6. A review of the direct and circumstantial evidence of legislative intent involved in the enactment of the statutory scheme challenged in this case persuasively establishes that content-based considerations were "a motivating factor" in the adoption of the legislation. First, contemporaneous statements made by legislators on the floor of the South Carolina House and Senate and in committees during consideration of the proposed legislation repeatedly focused upon the SCEA and its affiliation with the NEA, advocacy of unpopular legislative proposals and participation in the political process. Many of these statements were made by the key floor leaders opposing payroll deductions for the SCEA and constituted their primary

argument against the proposed legislation for professional associations.[14]

Second, the effect of the legislation was to deny payroll deductions for the SCEA, which was in 1981 the only employee organization actively seeking and currently receiving payroll deductions. Further, when the State Employees Association decided prior to the 1985 legislative that it desired payroll deduction, the statutory scheme was altered to accommodate this similarly situated organization. While the adverse effect of this legislative scheme on the SCEA, standing alone, does not give rise to a legal right for the plaintiffs, the close correlation between the announced purpose of the bill at the time of the legislative debate and the ultimate adverse impact tends to corroborate the legislative intent of denying payroll deduction for content-based reasons. When the amendment was offered in the House to permit voluntary deductions of professional association dues, a lengthy filibuster by Rep. Larry Koon ensued. The House ultimately adopted both payroll deduction for professional association dues and the Marchant amendment, which was specifically tailored to address the situation of a professional association which paid over a portion of the proceeds of payroll deduction to a labor organization. This amendment created a classification of one: the SCEA. Further, after the adoption of the Marchant Amendment, a new filibuster was started to stall legislative consideration while Rep. Marchant confirmed through an Attorney General's opinion that neither SCEA nor NEA could receive payroll deduction under this amendment. No other organization was referenced in Rep. Marchant's opinion request, and he specifically stated that his objective was to deny payroll deduction to the SCEA and NEA. Upon confirmation of the amendment's effect by the South Carolina Attorney General, the filibuster was terminated and the legislation was adopted by the House.

Moreover, when the bill adopted by the Senate contained a potential "loophole" for continuation of payroll deduction for the SCEA through teacher credit unions, the Conference Report, with Rep. Marchant's active encouragement, was twice rejected because it did not contain the full Marchant Amendment. Only after the Marchant Amendment was added to the Conference Report was the payroll deduction bill finally adopted by the House and Senate.

Additionally, the legislative history of payroll deduction for the State Employees Association further confirms the legislative intent to deny the benefits specifically to the SCEA. In 1985, despite the fact that the State Employees Association did not meet the six part test contained in South Carolina Code Section 8–11–92, a special exception was created by name for the State Employees organization in the Appropriations Act in 1987 for non-germaneness, expedited legislative consideration of an independent bill authorizing State Employees Association payroll deduction was given in both the House and Senate.

Fourth, the sequence of events leading to the adoption of the statutory scheme confirms the intent to deny specifically the SCEA the benefit of payroll deductions. The House bill was filibustered until the Attorney General Specifically assured Rep. Marchant that the SCEA and NEA were ineligible for payroll deductions. The Conference Report was twice rejected until the last possibility for payroll deductions for the SCEA, through credit unions, was eliminated. However, when a similarly situated and less controversial organization, the State Employees Association, sought payroll deductions, extra-ordinary efforts were undertaken to accommodate the group, despite the fact that it was classified as a "labor organization" under 501(c)(5) of the Internal Revenue Code.

Fifth, a careful review of the statutory language further corroborates the intention to tailor the legislation to deny payroll

14. Rep. Marchant's efforts to persuade the Internal Revenue Service to reclassify the SCEA as a labor organization, including hand-delivering his April 21, 1984 letter while in Washington for a meeting at the White House, further confirms the intention to deny specifically SCEA payroll deduction for content-related reasons.

deductions specifically to the SCEA for content-related reasons. South Carolina Code § 8–11–92 subd. A(2) expressly excludes "legal advocacy services which are provided directly to and specifically for one individual...." The SCEA in 1981 was the only state-wide employee organization providing direct legal services to its members in employee grievance matters. Section 8–11–92 subd. A(3) and (4) requires that an eligible organization be classified as a 501(c)(3) and not a (c)(4), (c)(5) or (c)(6) organization. Section 8–11–92 subd. A(6) requires that the qualifying organization not have a "parent organization" ineligible for payroll deduction benefits, regardless of whether payroll deduction proceeds were shared with the parent. Again, these provisions were designed to accomplish the announced purpose at the time of enactment, to deny payroll deductions to the SCEA. Further, despite the elaborate six part test in § 8–11–92, when the State Employee Association sought payroll deductions, these provisions were ignored and a specific exception by name was provided to that organization.

Sixth, the testimony by legislators at trial regarding their intent, while not as persuasive as contemporaneous evidence at the time of enactment, tended to confirm the presence of content-based intent. The Court found particularly persuasive the testimony of Rep. Koon, Senator McConnell and former Senator and now United States Congressman, Arthur Ravenel, who despite their continuing opposition to payroll deduction for the SCEA, acknowledged content-based purposes for the adoption of the statutory scheme.

7. The record persuasively establishes that "a motivating factor" in the enactment of the challenged legislation was the denial of payroll deduction benefits to the SCEA because of its affiliation with the NEA, advocacy of unpopular legislative proposals, endorsement of candidates and other content-related reasons. Such factors go to the essence of the First Amendment and concern some of the most fundamental rights under the Constitution: freedom of association, right to petition, freedom of speech and right to participate in the demo-

cratic electoral process. Legislation which withholds a benefit to parties because of their exercise of such fundamental rights can stand only where the defendants can establish the presence of a compelling State interest for the differential treatment afforded to the SCEA and the State Employees Association and demonstrate that the challenged legislation is narrowly drawn to accomplish this end. *Arkansas Writer's Project v. Ragland,* 107 S.Ct. at 1728.

■ 8. In addition to the challenge to the statutory scheme under the content theory described above, plaintiffs assert that the legislation is violative of the Fourteenth Amendment under the principles of *United States Department of Agriculture v. Mareno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 2825–2826, 37 L.Ed.2d 782 (1973), because there is not present a *legitimate* governmental purpose to support the classification. The record before the Court establishes that "a motivating factor" in the adoption of the legislation was the desire to weaken and harm a politically unpopular organization. Such a legislative purpose does not constitute a legitimate governmental interest to support the classification under *Mareno* and constitutes a separate and independent basis upon which to declare the statutory scheme as applied to the SCEA unconstitutional.

■ 9. The Court, having concluded that the challenged statutory scheme denies plaintiffs their rights under the First and Fourteenth Amendments of the United States Constitution, must devise an appropriate remedy. While the Court has broad latitude within its equitable powers either to extend to the plaintiffs the benefits unlawfully withheld or to nullify the preference afforded to others, an extension rather than nullification is generally favored. *Heckler v. Mathews,* 465 U.S. 728, 739 n. 5, 104 S.Ct. 1387, 1395 n. 5, 79 L.Ed.2d 646 (1984); *Califano v. Westcott,* 443 U.S. 76, 89, 99 S.Ct. 2655, 2663, 61 L.Ed.2d 382 (1979). *See also, Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Jimenez v. Weinberger,* 417 U.S.

628, 637–38, 94 S.Ct. 2496, 2502, 41 L.Ed.2d 363 (1974); *Frontiero v. Richardson,* 411 U.S. 677, 691 n. 25, 93 S.Ct. 1764, 1772–1773 n. 25, 36 L.Ed.2d 583 (1973). This remedy is particularly appropriate where the SCEA enjoyed widespread payroll deduction benefits until a portion of the challenged legislation was enacted in 1981, and nullification would result in substantial injury to another employee organization that played no role in the injury suffered by the SCEA. Furthermore, the presence of a severability clause in the 1981 legislation evidences an intent by the General Assembly to save, if possible, lawful portions of the statute if certain provisions are found to be improper. *Heckler v. Mathews,* 465 U.S. at 739 n. 5, 104 S.Ct. at 1395; *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

The Court hereby grants to the SCEA and its members payroll deduction benefits under the same terms and conditions provided to the State Employees Association. Specifically, the SCEA and its members shall be entitled to payroll deductions of membership dues to the SCEA and any affiliate organization with any public sector employer within South Carolina, including public school districts, so long as the public sector employer consents to the payroll deductions and the SCEA does not engage in collective bargaining in the public sector or encourage its members to strike. The plaintiffs' shall recover their costs, including attorney's fees pursuant to 42 U.S.C. Section 1988.

IT IS SO ORDERED.