883 F.2d 1251
 132 L.R.R.M. (BNA) 2288, 58 USLW 2173,
55 Ed. Law Rep. 870
 The SOUTH CAROLINA EDUCATION ASSOCIATION, et al.; Nelle H.
Taylor, Betty Jane Cunningham; Michael T.
Hollifield, Plaintiffs-Appellees,
v.
John T. CAMPBELL, In his Official Capacity as Secretary of
State of South Carolina; Carroll Campbell, In his Official
Capacity as Governor of the State of South Carolina; Earle
Morris, In his Official Capacity as Comptroller General of
the State of South Carolina, Defendants-Appellants;
The South Carolina State Employees Association; South
Carolina School Boards Association, Inc.; Richland County
School District Number One, Spartanburg County School
District Number Three, Orangeburg County School District
Number Five, Marlboro County School District and Dr. James
M. Brown, Superintendent and Chairman of the Board of
Trustees of the Oconee County School District, Amici Curiae.
 No. 88-3605.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 12, 1989.
Decided Aug. 28, 1989.
Rehearing and Rehearing In Banc Denied Oct. 18, 1989.
 
 Charles P. Roberts, III (Richard B. Kale, Jr., Haynsworth, Baldwin, Miles, Johnson, Greaves & Edwards, on brief), Greenville, S.C., for defendants-appellants.
 Leon Friedman (Richard Mark Gergel, Gergel, Burnette, Nickles, Grant & Ouzts, Columbia, S.C., on brief), for plaintiffs-appellees.
 Philip J. Mace, Victoria L. Eslinger, Deborah R.J. Shupe, Berry, Dunbar, Daniel, O'Connor, Jordan & Eslinger, Columbia, S.C., on brief, for amicus curiae, South Carolina State Employees Ass'n.
 Jane W. Trinkley, Deborah A. Davis, Edwin W. Johnson, II, McNair Law Firm, P.A., Columbia, S.C., on brief), for amicus curiae, South Carolina School Boards Ass'n, Inc.
 Before CHAPMAN and WILKINS, Circuit Judges, and KELLAM, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 CHAPMAN, Circuit Judge:
 
 
 1
 This case involves a challenge by plaintiffs/appellees, the South Carolina Education Association and various members of that organization (hereinafter collectively referred to as "SCEA"), to a statutory arrangement[1] they allege was designed specifically to deny the SCEA payroll deduction benefits and thereby impair the effectiveness of the association. In October 1987, the SCEA filed suit pursuant to 42 U.S.C. Sec. 1983 against John T. Campbell, Secretary of State for South Carolina; Carroll Campbell, Governor of South Carolina; and Earle Morris, Comptroller General of South Carolina, all acting in their official capacities. The SCEA asserted that it had been deprived of First and Fourteenth Amendment rights under these state laws.
 
 
 2
 The series of events giving rise to this action began in May 1979 when the Attorney General of South Carolina issued a nonbinding opinion that no public body could provide voluntary payroll deductions without statutory authorization. In 1981 the South Carolina General Assembly enacted facially neutral legislation which authorized payroll deductions for contributions to charitable organizations[2] but declined to authorize payroll deductions for membership dues to labor organizations or groups which forward the proceeds of deductions to such organizations. Among the groups denied payroll deductions under this legislation was the SCEA.
 
 
 3
 In 1987, the General Assembly passed permanent legislation, following two years of temporary legislation adopted in 1985 and 1986, authorizing payroll deductions for membership dues to the South Carolina State Employees Association ("State Employees Association").[3] The SCEA characterizes the State Employees Association as a "similarly situated" but "less controversial" organization than the SCEA. The differential treatment as to the statutory authorization for payroll deductions, the SCEA contends, arises from the General Assembly's disdain for the content of the SCEA's speech-related activities and its association with the National Education Association ("NEA"). The district court held that by permitting payroll deductions for payment of dues to the State Employees Association but denying the same service to the SCEA the General Assembly violated the SCEA's First and Fourteenth Amendment rights. The district court did not nullify the state law, but in effect rewrote it by ordering the state and all school districts to extend payroll deductions to the SCEA and its members.
 
 
 4
 We find the district court's extensive reliance on the testimony of individual members of the General Assembly as to legislative motive an improper intrusion into the legislative function, and the challenged legislation rationally related to legitimate state interests and does not violate either the First or Fourteenth Amendments. Therefore, we reverse.
 
 I.
 
 5
 Prior to 1981 the only statutorily authorized payroll deductions for public employees in South Carolina were deductions for federal and state income tax, social security, health and life insurance, and the purchase of savings bonds. It was the longstanding practice of some South Carolina school districts and some state agencies, absent statutory authorization, to deduct voluntarily from their employees' paychecks the dues for membership in various organizations including the SCEA and the State Employees Association. The State, however, never withheld SCEA dues for teachers employed directly by the State or state agencies.
 
 
 6
 In May 1979, the Attorney General of South Carolina issued an opinion advising that payroll deductions by public bodies without statutory authorization were improper. This opinion had no binding effect and many school districts continued the practice of voluntarily withholding SCEA membership dues.
 
 
 7
 In 1980, in order to avoid future challenge of this practice, the SCEA sought statutory authorization for payroll deductions by proposing legislation providing such deductions for "professional associations." A bill backed by the SCEA received a favorable report from the Senate Education Committee; and after extended debate on the floor, including a filibuster, it passed the Senate. It was late in the legislative session before the bill reached the House, which adjourned before taking action on the measure. In the Autumn of 1980, the South Carolina Comptroller General gave notice that he would cease withholding voluntary deductions from employee paychecks unless specifically authorized by statute. Again, this action did not affect the status of SCEA payroll deductions since most SCEA members did not have payroll deductions and were not on the State's payroll. Other nonprofit organizations were directly affected, including the United Way and Good Health Appeal.
 
 
 8
 Bills were introduced before the 1981 legislative session to provide for payroll deductions for charitable organizations. While these bills were pending in the South Carolina legislature amendments were introduced to authorize or require school districts to provide payroll deductions for professional associations. The House eventually adopted a proposal providing payroll deductions for charitable organizations, credit unions, and professional associations. The House bill included an amendment (the Marchant Amendment),[4] adopted following spirited debate, which prohibited payroll deduction benefits for any entity classified as a labor organization under federal tax or labor law, or which forwarded the proceeds of payroll deductions to such an organization. The companion bill in the Senate, introduced by Senator Heyward McDonald, specifically provided for payroll deductions for the United Way and Good Health Appeal. The legislation was eventually redrafted to permit payroll deductions for contributions to charitable organizations which met six eligibility criteria. This proposal had the effect of foreclosing payroll deduction services to the SCEA, the State Employees Association, and all professional associations representing state employees. Other amendments proposed to permit payroll deductions for payment of dues to professional associations were narrowly defeated.
 
 
 9
 A conference committee was appointed to reconcile the House and Senate bills. A couple of conference reports were rejected before language acceptable to both the House and Senate was adopted. The legislation eventually emerged as passed by the Senate, but included the House amendment pertaining to labor organizations. The bill was passed by the General Assembly and signed into law in June 1981.
 
 
 10
 Following the enactment of the 1981 legislation the school districts discontinued deducting SCEA dues from their employees' paychecks. The SCEA contends that "[t]his sudden and uniform loss of payroll deduction across the State had a devastating effect upon the SCEA's membership, financial standing and advocacy program." According to testimony before the district court, however, the SCEA had experienced a steady drop in membership since 1975, long before termination of payroll deductions services. Appellants suggest that declining membership was the result of internal organizational problems, increasing membership dues, competition from a rival education association, and controversial positions adopted by the SCEA.
 
 
 11
 In 1985, the State Employees Association began lobbying the South Carolina legislature to obtain payroll deductions for its members. The State Employees Association is a general interest organization open to all individuals employed directly by the state, regardless of their job classification or occupation. Members of the SCEA, with the exception of a few teachers employed directly by state agencies, are not state employees; rather, they are employed by individual school districts. The State Employees Association actively lobbies the state legislature on issues concerning state employment, and it provides a wide range of services to its members. The State Employees Association, unlike the SCEA, is not affiliated with any national organization. In response to the State Employees Association's lobbying efforts a provision to the 1985 South Carolina Appropriations Act was introduced to authorize payroll deductions for the State Employees Association.
 
 
 12
 After extensive and heated legislative debate, temporary authorization was approved by the Senate after a tie vote was broken by the Lieutenant Governor. The measure included an amendment which provided that payroll deductions would be terminated if the State Employees Association engaged in collective bargaining or advocated a strike of state employees. The temporary authorization was renewed in the 1986 Appropriations Act. In 1987, permanent legislation was introduced which specifically authorized payroll deductions for State Employees Association dues. This legislation passed the House and Senate, and it was submitted to Governor Carroll Campbell, who allowed the bill to become law without his signature, but the Governor noted he would look with great disfavor on any new legislation in this area.
 
 
 13
 When the State Employees Association sought statutory authority for payroll deductions, the issue of payroll deductions for the SCEA or any other professional association or organization was not before the legislature. The State Employees Association is the only organization granted an exception to the general statutory scheme established in 1981 for charities, credit unions and other financial institutions.
 
 
 14
 The SCEA initiated the present action in 1987, alleging that the 1981, 1985, 1986 and 1987 statutory provisions constituted violations of its First and Fourteenth Amendment rights by denying the SCEA a benefit extended to the "similarly situated" State Employees Association. The district court found that the 1985, 1986 and 1987 granting of payroll deductions to the State Employees Association confirmed the legislature's unlawful intention in 1981 to retaliate against the SCEA for its speech-related activities and constituted a denial of equal protection under the Fourteenth Amendment, and also a denial of SCEA's First Amendment rights.
 
 II.
 
 15
 The SCEA contends that the challenged statutory scheme authorizing payroll deductions was specifically tailored to exclude the SCEA from enjoying the valuable benefit of payroll deductions. This action, according to the SCEA, was motivated by the General Assembly's displeasure with the SCEA's speech-related activities and its affiliation with the NEA. Moreover, this intent was confirmed by the 1987 legislation extending payroll deduction benefits to the State Employees Association which the SCEA characterizes as a "similarly-situated but less controversial group." The SCEA's contention rests on the assumption that when membership dues are not withheld from wages, members are less likely to pay their dues and the association is impaired in its lobbying activities, legal advocacy program and other services. The SCEA thus positions its claim at the intersection of the First Amendment's protection of free speech and association and the equal protection clause's requirement that government afford like treatment to similarly situated parties.
 
 A.
 
 16
 Neither party disputes that the state is empowered to legislate in the area of payroll deductions for public employees. It is also uncontested that there is no constitutional right to payroll deductions. City of Charlotte v. Local 660, International Association of Firefighters, 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976). Contrary to the thrust of the SCEA's argument, the challenged 1981 legislation did not terminate payroll deductions for the SCEA per se. The General Assembly merely declined to extend statutory authorization for these services. This legislation, neutral on its face, stemmed from the opinion of the South Carolina Attorney General, and it impacted equally a number of professional associations.
 
 
 17
 The SCEA's First Amendment claim is not founded on any direct impact the legislation has on free speech or the free flow of information. Rather, it rests on the alleged anti-SCEA motivation of the General Assembly in not authorizing withholding for SCEA membership dues. The legislation in question is facially neutral and merely defines the type of deductions the state will authorize from the paychecks of state employees. This legislation does not prohibit, regulate, or restrict the right of the SCEA or any other organization to associate, to solicit members, to express its views, to publish or disseminate material, to engage in political activities, or to affiliate or cooperate with other groups. The burden, identified by the SCEA, is the loss of dues from members who might have paid, if a more convenient method of collecting dues was available. The SCEA attempts to construct a First Amendment claim by arguing, in essence, that revenues raised through a payroll deduction arrangement would have been available to further the SCEA's speech-related activities.
 
 
 18
 Although loss of payroll deductions may economically burden the SCEA and thereby impair its effectiveness, such a burden is not constitutionally impermissible. As the Supreme Court recently stated in response to a free speech claim of an organization denied tax exempt status:
 
 
 19
 We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny. Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), upheld a statute that provides federal funds for candidates for public office who enter primary campaigns, but does not provide funds for candidates who do not run in party primaries. We rejected First Amendment and equal protection challenges to this provision without applying strict scrutiny. Id., at 93-108, 96 S.Ct. at 670-677....
 
 
 20
 The reasoning of these decisions is simple: "although government may not place obstacles in the path of a [person's] exercise of ... freedom of [speech], it need not remove those not of its own creation." Harris [v. McRae], 448 U.S. [297, 316, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980) ]. Although [appellee] does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution "does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." Id., at 318, 100 S.Ct. at 2688.
 
 
 21
 Regan v. Taxation With Representation of Washington, 461 U.S. 540, 549-550, 103 S.Ct. 1997, 2003, 76 L.Ed.2d 129 (1983). See also Smith v. Arkansas State Highway Employees, 441 U.S. 463, 465-66, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979) (First Amendment does not impose any affirmative obligation on public employer to listen, to respond or to recognize union even if such failure tends to impair or undermine the effectiveness of the union); Arkansas State Highway Employees Local 1315 v. Kell, 628 F.2d 1099, 1102 (8th Cir.1980) (while the First Amendment protects the right to associate with others and the right of an association to engage in advocacy on behalf of its members, the First Amendment does not impose any duty on a public employer to assist affirmatively--by granting payroll deductions--or recognize a union, even if failure to do so impairs the union's effectiveness); Local 995, International Association of Firefighters v. City of Richmond, 415 F.Supp. 325 (E.D.Va.1976) (city's refusal to withhold union dues from fire fighters' paychecks does not violate union's First Amendment rights, even if such refusal could be said to have impaired union's organizational activities).
 
 
 22
 While we acknowledge that the First Amendment guarantees the right of association and the right of a professional association to express any ideas and to engage in advocacy on behalf of its members, the First Amendment does not impose an affirmative obligation on the state to assist the program of the association by providing payroll deduction services. Loss of payroll deductions, it is true, may tend to impair the effectiveness of the SCEA in representing its members, but we hold that such "impairment," like that in Smith, supra, is not one that the First Amendment proscribes. See Smith, 441 U.S. at 465, 99 S.Ct. at 1828. The state's failure to authorize payroll deductions for the SCEA does not deny SCEA members the right to associate, to speak, to publish, to recruit members, or to otherwise express and disseminate their views. Thus, we find no cognizable constitutional claim pursuant to the First Amendment.
 
 B.
 
 23
 The district court did not assert that the challenged legislation violated the First Amendment based on a showing that it directly inhibited free speech or association; rather, the First Amendment violation arose from the alleged subjective motivation of the South Carolina legislature. South Carolina Education Association v. Campbell, 697 F.Supp. 908, 918-20 (D.S.C.1988). The district court concluded that the General Assembly denied the SCEA payroll deduction benefits to retaliate against the SCEA for its controversial positions and political activities.[5]
 
 
 24
 The Supreme Court has long recognized that judicial inquiries into legislative motivation are to be avoided. Such inquiries endanger the separation of powers doctrine, representing a substantial judicial "intrusion into the workings of other branches of government." Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 268 n. 18, 97 S.Ct. 555, 565 n. 18, 50 L.Ed.2d 450 (1977).
 
 
 25
 Chief Justice John Marshall, in 1810, recognized the principle that the judiciary may not look to legislative motivation to invalidate state statutes. The Court declined to overturn a Georgia statute on the ground that its enactment had been procured by bribing the legislators. Chief Justice Marshall said for the Court:
 
 
 26
 It may well be doubted, how far the validity of a law depends upon the motives of its framers, and how far the particular inducements, operating on members of the supreme sovereign power of a state, to the formation of a contract by that power, are examinable in a court of justice. If the principle be conceded, that an act of the supreme sovereign power might be declared null by a court, in consequence of the means which procured it, still would there be much difficulty in saying to what extent those means must be applied to produce this effect. Must it be direct corruption? or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority? or on what number of the members? Would the act be null, whatever might be the wish of the nation? or would its obligation or nullity depend upon the public sentiment? If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned.
 
 
 27
 Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 130, 3 L.Ed.162 (1810).
 
 
 28
 More recently the Supreme Court upheld a congressional act punishing the destruction of draft cards which was challenged as having for its purpose the suppression of free speech. Chief Justice Earl Warren, speaking for the Court, stated:
 
 
 29
 It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive ...
 
 
 30
 Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.
 
 
 31
 United States v. O'Brien, 391 U.S. 367, 383-84, 88 S.Ct. 1673, 1682-83, 20 L.Ed.2d 672 (1968) (footnote omitted). See also Palmer v. Thompson, 403 U.S. 217, 224-26, 91 S.Ct. 1940, 1944-46, 29 L.Ed.2d 438 (1971); McCray v. United States, 195 U.S. 27, 53-59, 24 S.Ct. 769, 775-78, 49 L.Ed. 78 (1904).
 
 
 32
 This Court, sitting en banc, addressed the issue of judicial inquiry into legislative motive in Holt v. City of Richmond, 459 F.2d 1093 (4th Cir.), cert. denied, 408 U.S. 931, 92 S.Ct. 2510, 33 L.Ed.2d 343 (1972). The plaintiffs in this case challenged an annexation agreement between the City of Richmond and a neighboring county claiming that it was motivated by a desire to deny blacks within the city a racial majority and the opportunity to gain additional representation on city council. We stated: "[w]hen the legislative purpose is not both obvious and constitutionally impermissible, however, the cases uniformly hold that facially constitutional legislation may not be stricken because of suspect legislative motivation." Id. 459 F.2d at 1098. We further opined that where legitimate reasons exist for the challenged action "it far surpasses judicial power to strike down legislative action because some of the legislators may have been motivated by some impermissible reason in addition to those acknowledged permissible and legitimate reasons." Id. at 1099-1100.
 
 
 33
 Similarly, in Wall Distributors, Inc. v. City of Newport News, Virginia, 782 F.2d 1165 (4th Cir.1986), we declined in the context of a First Amendment case to speculate on the motives of lawmakers. The plaintiff challenged a local ordinance which restricted the exhibition of films in closed booths. The plaintiff asserted that "the sole motive for [the ordinance's] adoption was that of suppressing erotic materials." Id. at 1170. We, again relying on O'Brien, refrained from engaging in an inquiry into legislative motive:
 
 
 34
 [T]he O'Brien test requires that the government interest not be related to suppression of free expression. Under this element, courts must "eschew altogether the 'guesswork' of speculating about the motive of lawmakers." Hart [Book Stores, Inc. v. Edmisten], 612 F.2d [821, 829 (4th Cir.1979) ]. Instead, courts must look only to the face of the regulation and the identifiable interest advanced to justify the regulation. Id. On its face and under the interests advanced by the City, the open booth regulation is designed to promote public welfare by preventing unsanitary, offensive or dangerous conditions in arcades.
 
 
 35
 Although [appellant] protests that only "adult" movies are impacted by the regulation, clearly demonstrating that the sole motive for its adoption was that of suppressing erotic materials, so to conclude would involve precisely the type of speculation into legislative motive that we must avoid in assessing this type of constitutional challenge to legislation. We therefore decline to look past the facially apparent effect of the regulation and the interest based purpose advanced for its adoption by the City.
 
 
 36
 Id. at 1170.
 
 
 37
 We acknowledge, as the Supreme Court noted in O'Brien, that there are limited exceptions to the principle that judicial inquiry into legislative motive is to be avoided. These exceptions include cases in which "the very nature of the constitutional question requires an inquiry into legislative purpose." O'Brien, 391 U.S. at 383 n. 30, 88 S.Ct. at 1682 n. 30. Such exceptions include race and sex discrimination cases[6] and establishment of religion cases,[7] as well as cases challenging statutes which on their face directly inhibit or have the inevitable effect of inhibiting freedom of speech or related constitutional rights.[8] Motive is thus relevant in these cases only insofar as the Courts have expressly deemed it a substantive element of the test of constitutionality.
 
 
 38
 The challenged legislation in the case at bar is clearly not among the limited and well defined exceptions to the principle discouraging judicial inquiry into legislative motive. The 1981 legislation only defines the types of deductions the state will authorize from the paychecks of state employees and does not restrict, on its face, the First Amendment rights of the SCEA to solicit members, to speak in open fora, to associate with any other organization, to engage in political activities, or to otherwise represent its members.
 
 
 39
 We hold that the district court erred in admitting, over the appellants' objections, the testimony of present and past members of the General Assembly as to legislative motive. The Supreme Court has counseled that placing decisionmakers on the stand in order to uncover the motivation behind an official action is "usually to be avoided." Village of Arlington Heights, 429 U.S. at 268 n. 18, 97 S.Ct. at 565 n. 18, quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).
 
 
 40
 The district court also failed to give due deference to state rules regarding competent evidence of legislative intent. Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 580 n. 3, 103 S.Ct. 1365, 1369 n. 3, 75 L.Ed.2d 295 (1983). The testimony of legislators is not evidence of legislative intent under South Carolina law. In Tallevast v. Kaminski, 146 S.C. 225, 236, 143 S.E. 796, 799 (1928), the South Carolina Supreme Court stated:
 
 
 41
 It is a settled principle in the interpretation of statutes that even where there is some ambiguity or uncertainty in the language used, resort cannot be had to the opinions of legislators or of others concerned in the enactment of the law for the purpose of ascertaining the intent of the Legislature. To resort to the views of individuals, even of legislators, after the legislation has been enacted, would involve the interpretation of the law in endless confusion and uncertainty.
 
 
 42
 See also Greenville Baseball, Inc. v. Bearden, 200 S.C. 363, 371, 20 S.E.2d 813, 817 (1942).
 
 
 43
 Attendant to the enactments of a state legislature is a "strong presumption of validity and constitutionality." Barwick v. Celotex Corp., 736 F.2d 946, 955 (4th Cir.1984). When adjudicating the constitutionality of an act of a state legislature, the Supreme Court has acknowledged it "must have 'due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government.' " Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981), quoting Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 164, 71 S.Ct. 624, 644, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).
 
 
 44
 The district court held, citing Village of Arlington Heights, supra, that to establish the presence of an unconstitutional content-based governmental action, the SCEA need not show that the decision was "motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." Village of Arlington Heights, 429 U.S. at 265, 97 S.Ct. at 563. The SCEA, the district court ruled, need only show that the legislature acted at least in part for the purpose of accomplishing the unconstitutional and adverse effects. SCEA, 697 F.Supp. at 918. This holding is incompatible with recent instructions from the Supreme Court. For example, in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Court reviewed a zoning regulation which restricted the location of adult theaters. Because the regulation was based on content, the Court had to consider whether this "time, place, and manner" regulation was reasonable and "unrelated to the suppression of free expression." Id. at 48, 106 S.Ct. at 929. The Court concluded that the regulation was unrelated to the suppression of free expression. In rejecting the free speech claim, the Court stated:
 
 
 45
 According to the Court of Appeals, if "a motivating factor " in enacting the ordinance was to restrict respondents' exercise of First Amendment rights the ordinance would be invalid, apparently no matter how small a part this motivating factor may have played in the City Council's decision.... This view of the law was rejected in United States v. O'Brien, 391 U.S. at 382-386, 88 S.Ct. at 1681-1684.
 
 
 46
 Id. at 47, 106 S.Ct. at 929. Thus, in cases where motive is deemed relevant, the Court has instructed that more than merely "a motivating factor" which is illicit is necessary to invalidate an otherwise constitutional statute.
 
 
 47
 Although they are not to be considered controlling, legislative debates have been frequently deemed appropriate sources of information from which courts can ascertain the history of the period in which a statute was enacted and the concerns which the statute was intended to address, and thus cast light upon a statute's proper interpretation. But this is quite different from what we are asked to do in the case at bar. Appellees instruct us to look beyond facially neutral legislation and in reliance upon the opinions of selected members of the South Carolina General Assembly, as recollected in the dock by legislators long after the challenged statute was debated, divine an unconstitutional legislative motive behind the challenged legislation. It is manifestly impossible to determine with certainty the motivation of a legislative body by resorting to the utterances of individual members thereof--even statements made by sponsors and authors of the act[9]--since there is no way of knowing why those, who did not speak, may have supported or opposed the legislation. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 318-19, 17 S.Ct. 540, 550, 41 L.Ed. 1007 (1897).
 
 
 48
 Musing on the difficulty of divining subjective legislative motivation, Justice Antonin Scalia opined that
 
 
 49
 discerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed finite.... [The legislator] may have thought the bill would provide jobs for his district, or may have wanted to make amends with a faction of his party he had alienated on another vote, or he may have been a close friend of the bill's sponsor, or he may have been repaying a favor he owed the Majority Leader, or he may have hoped the Governor would appreciate his vote and make a fundraising appearance for him, or he may have been pressured to vote for a bill he disliked by a wealthy contributor or by a flood of constituent mail, or he may have been seeking favorable publicity, or he may have been reluctant to hurt the feelings of a loyal staff member who worked on the bill, or he may have been settling an old score with a legislator who opposed the bill, or he may have been mad at his wife who opposed the bill, or he may have been intoxicated and utterly un motivated when the vote was called, or he may have accidentally voted "yes" instead of "no," or, of course, he may have had (and very likely did have) a combination of some of the above and many other motivations. To look for the sole purpose of even a single legislator is probably to look for something that does not exist.
 
 
 50
 Edwards v. Aguillard, 482 U.S. 578, 636-37, 107 S.Ct. 2573, 2605, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting). See also Aldridge v. Williams, 44 U.S. (3 Howard) 9, 24, 11 L.Ed. 469 (1845) (references to the motives of individual members of legislature enacting a statute are uniformly disregarded for interpretative purposes except as expressed in the statute itself); Wallace v. Jaffree, 472 U.S. 38, 74, 105 S.Ct. 2479, 2499, 86 L.Ed.2d 29 (1984) (O'Connor, J., concurring) ("a court has no license to psychoanalyze the legislators"); Murphy v. Empire of America, FSA, 746 F.2d 931, 935 (2d Cir.1984) (isolated remarks in legislative debate are entitled to little or no weight, particularly when they are unclear or conflict with other comments); In re Kelly, 841 F.2d 908, 912 n. 3 (9th Cir.1988) ("Stray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted on the bill. The opposite inference is far more likely."); In re Carlson, 292 F.Supp. 778, 783 (C.D.Cal.1968) ("In the course of oral argument on the Senate Floor, the choice of words by a Senator is not always accurate or exact. For this reason, courts have held that statements in debate are not a proper measure of the contents of a statute.").
 
 
 51
 The case at bar illustrates the hazards of delving into legislative intent or motive and attributing unconstitutional motives to state legislatures. It is axiomatic that if motivation is pertinent, it is the motivation of the entire legislature, not the motivation of a handful of voluble members, that is relevant. Aldridge v. Williams, 44 U.S. (3 Howard) 9, 24, 11 L.Ed. 469 (1845). The South Carolina General Assembly has 124 House members and 46 Senators. Sixteen present and past legislators were called to testify in the district court. They were examined on the content of their speeches and the statements made by colleagues in the legislative chamber. They were quizzed about their motives in supporting or opposing various legislative actions, and some were even asked to speculate about the motives of colleagues. Such an inquiry is inimical to the independence of the legislative branch and inconsistent with the constitutional concept of separation of powers. Moreover, probing inquiries by federal courts into the motivations of legislatures by calling representatives to testify concerning their motivations and those of their colleagues will doubtlessly have a chilling effect on the legislative process. The testimony indicated that in the 1980 legislative session only three Senators[10] were identified as making comments adverse to the SCEA, and in the 1981 session five senators[11] and two Representatives[12] spoke against the SCEA. The record is silent as to whether the views of these nine legislators actually reflected the sentiments of the legislature as a whole or persuaded others to adopt the challenged legislation.
 
 
 52
 In the case at bar, legislators testified to multiple legitimate reasons why they endorsed the challenged legislation. For example, Senator John Drummond, identified as a leading opponent of the SCEA, testified that he opposed the deductions because he recalled his childhood as one of seven children of an impoverished textile worker whose paycheck was frequently consumed by deductions to the company store. Drummond, incidentally, also voted against deductions for the State Employees Association. A number of legislators testified at trial that they voted against dues deductions for professional associations, despite amicable relations with the SCEA, because they were opposed to the state expending time and money arranging payroll deductions for any organization.
 
 
 53
 Determining the subjective intent of legislators and the collective motivation of legislatures is a perilous enterprise indeed. The legislative record is manifestly sparse and contradictory, and "the stakes," as the O'Brien Court counseled, "are sufficiently high for us to eschew guesswork." O'Brien, 391 U.S. at 384, 88 S.Ct. at 1683. We, therefore, conclude that the district court's imputation to the General Assembly of the apparent motivations of a few voluble legislators[13] and general reliance on the testimony of select legislators was inappropriate under both state and federal rules of statutory construction.
 
 C.
 
 54
 In addition to arguing that the challenged 1981 legislation depriving the SCEA of payroll deductions was unconstitutionally motivated by the General Assembly's displeasure with its speech-related activities, the SCEA contends that its equal protection rights were violated by the granting of statutory authorization for payroll deduction benefits to a "similarly situated" employee organization. Such differential treatment, it is argued, renders the law irrational under the equal protection clause. The district court incorrectly concluded that the state had abridged fundamental free speech and association rights of the SCEA and, therefore, applied the "strict scrutiny" standard to the state's actions. SCEA, 697 F.Supp. at 917. Ascertaining no "compelling state interest," the district court found the challenged statutory scheme violative of the Fourteenth Amendment. Id. at 920.
 
 
 55
 As discussed above, we hold the district court erred in finding that the challenged legislation impermissibly prohibited, regulated or restricted the SCEA's free speech and association rights. Therefore, the General Assembly's refusal to authorize payroll deductions to professional associations and subsequent decision to extend such services to the State Employees Association need only be rationally related to the furtherance of a legitimate governmental interest. See City of Charlotte, 426 U.S. at 286, 96 S.Ct. at 2038-39. See also Regan, 461 U.S. at 549, 103 S.Ct. at 2002-03 (legislature's decision not to subsidize an organization does not infringe First Amendment rights and is not subject to strict scrutiny).[14]
 
 
 56
 The 1981 legislation, according to testimony before the district court, was not targeted solely at the SCEA. The principal draftsman of the six part test of the 1981 legislation, Senator Heyward McDonald, noted that it was directed at and impacted organizations in addition to the SCEA. It is readily apparent that the 1981 legislation declined to authorize payroll deductions for all professional associations representing state employees, such as the South Carolina Law Enforcement Officers Association, the South Carolina Association of Social Workers, and the South Carolina Environmental Workers Association. Indeed, even the State Employees Association was denied payroll deduction services under the 1981 legislation and only gained authorization for deductions after lobbying the legislature in 1985, 1986 and 1987. Unlike the State Employees Association, the SCEA, significantly, has made no legislative effort to obtain payroll deductions since 1981.[15]
 
 
 57
 In City of Charlotte, which involved the refusal of a municipality to withhold union dues, the Supreme Court held that a policy of allowing payroll deductions only when it benefits all employees is not so devoid of reason as to violate the equal protection clause and is a legitimate method for avoiding the burden of withholding money for all persons or organizations that request payroll deductions. The Court held that disparate treatment in authorizing payroll deductions "must meet only a relatively relaxed standard of reasonableness in order to survive constitutional scrutiny." City of Charlotte, 426 U.S. at 286, 96 S.Ct. at 2038. In an equal protection case of this type, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Vance v. Bradley, 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979).
 
 
 58
 There are several apparent legitimate bases for the classification in the case at bar. It would be unduly burdensome and expensive--administratively and financially--for the State and its political subdivisions to withhold membership dues for every organization that requests it. Furthermore, the State, as employer, has a legitimate interest in enacting legislation which is a potential benefit to all State employees. The State has an interest in fostering good employer-employee relations and improving morale among the State's employees, which is arguably advanced by authorizing payroll deductions for the State Employees Association. The State Employees Association is a "general interest" association open to all State employees without regard to occupation or job classification. Although other professional associations represent State workers, none define their membership as broadly or their objective as comprehensively as the State Employees Association. The SCEA, on the other hand, is a "special interest" association open only to individuals employed in the South Carolina public education system. The SCEA's focus is on education-related issues arising from the special interests of its members. Moreover, most SCEA members are not State employees, but are employed by school districts which are semi-autonomous political subdivisions of the State.
 
 
 59
 The State's decision in this instance to treat the State Employees Association as a general interest group differently from programs of special interest does not appear "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." Vance v. Bradley, 440 U.S. at 97, 99 S.Ct. at 943. As the Court concluded in City of Charlotte:
 
 
 60
 We cannot say that denying withholding to associational or special interest groups that claim only some departmental employees as members and that employees must first join before being eligible to participate in the checkoff marks an arbitrary line so devoid of reason as to violate the Equal Protection Clause. Rather, this division seems a reasonable method for providing the benefit of withholding to employees in their status as employees, while limiting the number of instances of withholding and the financial and administrative burdens attendant thereon.
 
 
 61
 City of Charlotte, 426 U.S. at 288, 96 S.Ct. at 2039-40. The Court further observed that even if the burden of authorizing deductions for the union was minimal by itself, the city was entitled to draw lines "in order to avoid the cumulative burden of processing deductions every time a request is made." Id.
 
 
 62
 Since the actions of the General Assembly in the case at bar were reasonable and based on rational distinctions between employee groups and between the employers involved, we find there was no violation of the equal protection clause when the legislature gave the State Employees Association the benefit of payroll deductions. Therefore, the district court's order finding a Fourteenth Amendment violation is reversed.
 
 III.
 
 63
 We, therefore, conclude that the challenged statutory scheme does not, on its face, impermissibly burden the SCEA's speech and associational rights under the First Amendment, and, absent abridgement of such fundamental interests the district court erred in admitting the trial testimony of past and present members of the South Carolina General Assembly as evidence of an allegedly illicit legislative motive, and in finding that the legislation violated the First Amendment. We further find that the challenged legislative enactments were reasonably based on rational distinctions; consequently, the equal protection claim must also fail.
 
 
 64
 Accordingly, the order of the district court is REVERSED.
 
 
 
 [1]
 South Carolina Code Secs. 8-11-83, 8-11-91 to 8-11-98
 
 
 [2]
 South Carolina Code Sec. 8-11-92. Qualifying criteria for charitable organizations; Secretary of State to determine eligibility
 A. Nonprofit charitable organizations for which such payroll deductions may be made shall include any nonprofit, eleemosynary corporation, association or organization which is organized and operated exclusively for charitable, health, or welfare services to the public and meets all of the following qualifications:
 (1) Is and continues to be organized and qualified to solicit and operate under the laws of this State, pursuant to Chapter 55 of Title 33;
 (2) Provide direct and continuing services to or on behalf of the citizens of the State. For purposes of this section, "direct and continuing services" means: (a) services other than legal advocacy services which are provided directly to and specifically for one individual or one family; or (b) services which are in the nature of medical research; or, (c) services which involve the collection and administration of funds by umbrella organizations for other organizations, all of which qualify under this act;
 (3) Is recognized as tax exempt under Section 501(c)(3) of Title 26, United States Code (the Internal Revenue Code of 1954, as amended);
 (4) Is not an organization contemplated by Section 501(c)(4), 501(c)(5), or 501(c)(6) of Title 26, United States Code (the Internal Revenue Code of 1954, as amended) and is not an organization primarily engaged in the propagation of a religious faith or belief; this prohibition shall include, but not be limited to, organizations primarily engaged in lobbying or political activity;
 (5) Is operated without discrimination in regard to all persons served, and complies with all requirements of law, including administrative regulations, respecting nondiscrimination and equal opportunity regarding its officers, staff, employees and volunteers;
 (6) Has neither a parent organization nor a subsidiary organization which fails to meet qualifications herein contained in items (1) through (5).
 B. The Secretary of State shall determine on an annual basis, based upon the applications of nonprofit, charitable organizations and groups of such organizations, those which are eligible to participate in payroll deductions for state-employee contributions. His decision shall be final unless determined by a court of competent jurisdiction to be arbitrary, capricious or unsupported by any credible evidence.
 
 
 [3]
 South Carolina Code Sec. 8-11-83. Payroll deduction for dues of State Employees' Association
 The Comptroller General and all other state agencies, upon request of employees of the State, shall make deductions from the compensation of the employees for the payment of membership dues for the South Carolina State Employees' Association. The Comptroller General and state agencies shall pay over to the association all amounts so collected or withheld. Retirees from a state agency also may have withheld from their state retirement benefits their membership dues for the South Carolina State Employees' Association. No deduction is permitted if the association at any time engages in collective bargaining or encourages its members to strike.
 
 
 [4]
 The Marchant Amendment provided as follows:
 Section 3. Notwithstanding any other provision of this act, including definitions of organizations eligible for payroll deductions, such provisions shall not be construed to include any organization recognized or classified as a labor organization under Section 501(c)(5) of Title 26 of the United States Code Annotated, by the United States Department of Labor, or by any court of competent jurisdiction nor shall any such deduction be made if any of the proceeds of the deduction would be for the benefit of any such organization.
 
 
 [5]
 In Kell, supra, the district court concluded, and the Court of Appeals affirmed, that "even a retaliatory termination of the deduction of union dues would not infringe appellees' First Amendment rights, nor would it constitute an unpermitted discrimination in violation of the equal protection clause...." Kell, 628 F.2d at 1102
 
 
 [6]
 The Supreme Court has indicated that in adjudicating constitutional challenges to governmental actions on the grounds of race or sex discrimination more than evidence of disproportionate impact on a minority is required to find the action unconstitutional. Therefore, proof of specific discriminatory intent or motive is also necessary. See, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 562-63, 50 L.Ed.2d 450 (1977) (race discrimination); Washington v. Davis, 426 U.S. 229, 242-43, 96 S.Ct. 2040, 2048-49, 48 L.Ed.2d 597 (1976) (same); Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 274-75, 99 S.Ct. 2282, 2293-94, 60 L.Ed.2d 870 (1979) (sex discrimination). While legislative motive is not the sole basis for striking down a legislative enactment, it may be relevant insofar as the Court has held that unlawful motive is a specific element of the test of constitutionality
 
 
 [7]
 The constitutional test articulated by the Court for controversies arising under the First Amendment establishment of religion clause is a three-pronged test, Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the first of which is that "the legislature must have adopted the law with a secular purpose." Edwards v. Aguillard, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987). See also Wallace v. Jaffree, 472 U.S. 38, 56-61, 105 S.Ct. 2479, 2489-92, 86 L.Ed.2d 29 (1985); Epperson v. Arkansas, 393 U.S. 97, 109, 89 S.Ct. 266, 273, 21 L.Ed.2d 228 (1968)
 
 
 [8]
 Legislative motive, in the context of First Amendment controversies, may be relevant when the challenged legislation has on its face some content-based, direct inhibiting effect on freedom of speech or some other expressive activity or enterprise. See, e.g., Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); Arkansas Writer's Project, Inc. v. Ragland, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); FCC v. League of Women Voters of California, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); Boos v. Barry, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); Board of Education, Island Trees Union Free School District No. 26 v. Pico, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982); News America Publishing, Inc. v. FCC, 844 F.2d 800 (D.C.Cir.1988)
 
 
 [9]
 Jennison v. Kirk, 98 U.S. 453, 459-60, 25 L.Ed. 240 (1878) ("statements of the author of the act in advocating [a statute's] adoption cannot, of course, control its construction")
 
 
 [10]
 Senators John Drummond, Charles Garrett, and Gilbert McMillan
 
 
 [11]
 Senators John Drummond, Norma Russell, Arthur Ravenel, Marion Gressette, and Glenn McConnell
 
 
 [12]
 Representatives Thomas Marchant and Larry Koon
 
 
 [13]
 See News America Publishing, Inc. v. FCC, 844 F.2d 800, 810 n. 12 (D.C.Cir.1988) ("Any judicial use of legislators' remarks for imputing an unconstitutional motive to the legislative majority (as opposed to merely inferring the intended meaning of ambiguous legislation) raises troubling questions")
 
 
 [14]
 It should be noted that the Supreme Court has specifically rejected an inquiry into motive in an equal protection claim:
 Petitioners have also argued that respondents' action violates the Equal Protection Clause because the decision to close the pools was motivated by a desire to avoid integration of the races. But no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.
 Palmer v. Thompson, 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971).
 
 
 [15]
 The SCEA also contends, and the district court found, that the General Assembly's action granting payroll deduction to the State Employees Association in 1985 evidences its unlawful intent to discriminate against the SCEA four years earlier. SCEA, 697 F.Supp. at 919. This conclusion, however, ignores the fact that the SCEA did not seek statutory authorization for payroll deductions in 1985, 1986 or 1987. It is particularly hazardous to infer the intent and motivation of one legislative body from the actions of a subsequent session of the same legislative body. See South Carolina v. Regan, 465 U.S. 367, 379-80 n. 17, 104 S.Ct. 1107, 1114-15 n. 17, 79 L.Ed.2d 372 (1984)